IRWIN I. KIMMELMAN, ATTORNEY GENERAL OF THE STATE OF NEW JERSEY, PLAINTIFF-APPELLANT, v. HENKELS & MCCOY, INC., DEFENDANT-RESPONDENT, AND STRACO CONSTRUCTION CO.; AND AGABITI BROS., INC.; AND ARMANDO A. AGABITI, EACH INDIVIDUALLY, DEFENDANTS.

Argued February 2, 1987—Decided July 22, 1987.

*Laurel A. Price,* Deputy Attorney General, argued the cause for appellant (*W. Cary Edwards,* Attorney General of New Jersey, attorney).

*Steven A. Asher,* a member of the Pennsylvania bar, argued the cause for respondent (*LaBrum and Doak,* attorneys).

The opinion of the Court was delivered by

GARIBALDI, J.

This case requires us to determine the scope and applicability of the civil remedies set forth in *N.J.S.A.* 56:9–10c for violations of the New Jersey Antitrust Act (the "Antitrust Act" or "Act"), *N.J.S.A.* 56:9–1 to –19.

I

The Attorney General filed a civil complaint against Henkels & McCoy, Inc. (H & M), Straco Corporation Co. (Straco), Agabiti Bros., Inc. (Agabiti), and Armando Agabiti, alleging that they had violated *N.J.S.A.* 56:9–3 [1] by conspiring to rig bids, fix prices, and allocate territories for certain construction work performed for Public Service Electric & Gas Co. and Elizabethtown Gas Co.

---

[1] *N.J.S.A.* 56:9–3 provides: "Every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce in the state shall be unlawful."

After the completion of discovery, the trial court granted the Attorney General's motion for summary judgment. In granting the motion for summary judgment, the trial court made the following relevant findings of fact:

> The overwhelming weight of the evidence satisfies the Court as a matter of law that the plaintiff has established a loose, but persistent, agreement among the defendants, beginning prior to the effective date of the act (May 21, 1970) and continuing until late 1982, to exchange bids about to be submitted to Public Service, and, in at least one instance, Elizabeth Gas Co., for a variety of general construction work.... At some point prior to 1970 a practice began whereby an employee of Straco and Henkels conferred on their respective bids on the annual blanket contracts to be awarded by Public Service Electric and Gas Co. It is unclear who instigated these discussions or whether they were conducted initially by phone or in person but Straco sought to protect its Camden "territory." Few in person meetings were necessary as it became a simple matter to agree by phone on the percentage increase for the new "blankets" for each year as they came up for bid.
>
> The basic technique was simple: Henkels would bid high on Camden contracts relative to Straco and it, in turn, would do likewise on Burlington work thus guaranteeing at least between them which company would get the work in those counties. At some point Agabiti also joined the plan although it is not clear exactly when.
>
> \* \* \* \* \* \* \* \*
>
> This conspiracy continued up to and after the passage of the State Antitrust Act essentially unchanged but for the company personnel who carried it out until some point in the middle 1970's when, for a three year period, there was a "hiatus" during which it was essentially "every man for himself" due to scarcity of work. After this hiatus a meeting of the principals took place and the arrangement resumed full scale until it finally dissolved at some point prior to 1983.
>
> During this entire time the participants, all of whom testified at depositions, met less than 10 times face-to-face but conferred by phone annually to adjust blanket bids and, as necessary, to decide on the individual gas main bids. None of the participant witnesses could pinpoint the date of any of the face-to-face meetings or phone calls or specifically which of the contracts awarded were actually the product of a rigged bid. Furthermore, according to them there was no guarantee that bidders not part of the scheme would not win a bid. [No. C-1038-83, slip op. at 3-5].

The Attorney General requested the trial court to impose civil penalties against the defendants of $2.1 million—representing $500 for each day that the conspiracy continued after the

effective date of the Antitrust Act.[2] Instead, the trial court imposed a civil penalty of $100,000 on H & M and a penalty of $20,000 on Agabiti.[3] Although the court acknowledged that "$100,000 is probably inadequate to deter a company the size of Henkels and McCoy, which experienced a gross profit of over $44,000,000 in 1982, from further violations of the law," it felt that it was precluded from imposing a greater fine by "certain conceptual and practical difficulties."

The Appellate Division affirmed substantially for the reasons stated by the trial court. 208 *N.J.Super.* 508 (1986). We granted certification, 105 *N.J.* 533 (1986), limited solely to the issue of whether in its imposition of civil penalties the trial court properly construed *N.J.S.A.* 56:9–10c.

## II

The language of the Antitrust Act and the fundamental public policy underlying the Act lead us to conclude that the decisions of the lower courts in this case were based on a misinterpretation of the applicable law. We find that the Legislature intended to authorize courts to impose per diem penalties that in the aggregate may exceed $100,000.

█ In construing a statute we first consider its plain language. *Renz v. Penn Cent. Corp.*, 87 *N.J.* 437, 440 (1981); *Sheeran v. Nationwide Mut. Ins. Co., Inc.*, 80 *N.J.* 548, 556 (1979). *N.J.S.A.* 56:9–10c provides that any person who violates the Antitrust Act "shall be liable to a penalty of *not more than* the greater of $100,000.00 or $500.00 per day for each and every day of said violation" (emphasis added). Thus, the plain meaning of the statute discloses that the Legislature authorized

---

[2]The Attorney General argued that the conspiracy lasted for at least 4208 days after the effective date of the Act.

[3]Straco and Agabiti entered into consent decrees with the Attorney General. Hence, they are not parties to this appeal.

the imposition of *either* a lump sum penalty of up to $100,000, or a per diem penalty of up to $500 a day, whichever is greater.

■ This interpretation is totally consistent with the Legislature's intent. In discerning that intent we consider not only the particular statute in question, but also the entire legislative scheme of which it is a part. *State v. Wright,* 107 *N.J.* 488, 497 (1987); *Denbo v. Moorestown Township,* 23 *N.J.* 476, 481 (1957); *State v. Brown,* 22 *N.J.* 405, 415 (1956). Although the legislative history of the Antitrust Act is sparse, the full title of the Act indicates the underlying policy of the Act:

> An Act to promote the unhampered growth of commerce and industry throughout the State by prohibiting restraints of trade which are secured through monopolistic practices and which act or tend to act to decrease competition between and among persons engaged in commerce and trade, whether in manufacturing, distribution, financing, and service industries or in related for profit pursuits, and making an appropriation therefore. [*L.*1970, *c.* 73.]

Moreover, *N.J.S.A.* 56:9–18 provides that the Antitrust Act "shall be construed in harmony with ruling judicial interpretations of comparable [f]ederal antitrust statutes." An examination of federal law as well as state law is therefore instructive as to the underlying policy reasons for imposing civil penalties in antitrust matters and the scope of per diem penalties.

Today, the "civil money penalty has unquestionably come of age. Disillusioned with cumbersome criminal, injunctive, and license-removal sanctions, students of regulation have increasingly turned to the civil fine in their search for a more effective enforcement device." Driver, "The Assessment and Mitigation of Civil Money Penalties by Federal Administrative Agencies," 79 *Colum.L.Rev.* 1435, 1436 (1979) (hereinafter referred to as Driver, Civil Money Penalties) (footnotes omitted). Civil monetary penalties deter future unlawful behavior by the defendant and those similarly situated. *Id.* at 1456. Federal courts have held that a per diem civil penalty is particularly suited for deterring such antitrust practices as conspiracies to fix prices that occur "continuously" over a period of time. *See United States v. ITT Continental Baking Co.,* 420 *U.S.* 223, 231, 95 *S.Ct.* 926, 931, 43 *L.Ed.*2d 148, 158 (1975); *United States v.*

*Phelps Dodge Indus., Inc.*, 589 *F.Supp.* 1340, 1361 (S.D.N.Y. 1984) ("[e]ffective deterrence requires daily penalties" for conspiring to fix prices).

Civil penalties also can compensate society at large for the harm it has suffered at the hands of the violators and compensate the government for the cost of enforcing the applicable law. Driver, Civil Money Penalties, *supra*, 79 *Colum.L.Rev.* at 1468–69. *See In re Garay*, 89 *N.J.* 104, 114 (1982) (fines for medicaid fraud constitute "liquidated damages" for the state's costs in investigating fraud and bringing legal action).

Another reason for favoring civil penalties is the difficulty involved in proving a criminal antitrust case. In *State v. Lawn King, Inc.*, 84 *N.J.* 179, 215 (1980), we recognized the "enormous difficulties entailed in a criminal antitrust prosecution, attributable primarily to the intractable complexities intrinsic to the subject matter, the principles of law involved ... and ... the heavy burden of proof on the State in a criminal case." Indeed, in that case we questioned "whether the important interests sought to be vindicated by this criminal prosecution could not have been more appropriately protected through civil suits under the State Antitrust Act." *Id.* at 215.

Moreover, from the State's standpoint the results of civil and criminal antitrust actions are essentially identical. In many antitrust cases it is necessary to immunize the principal actors in the underlying conspiracy in order to prove its existence. Such was the case here. Once the actors within the conspiracy have been immunized, the only parties left for prosecution are corporations. Obviously a corporation cannot be incarcerated. Accordingly, the only remedy that can be imposed after a criminal prosecution is a fine. Unless the State continues to have the option to impose meaningful civil penalties, it will be forced to institute criminal proceedings in cases, such as this one, in which the only issue to be resolved is the amount of the penalty, if any, to be paid by the violator. Such an effect would

be costly and burdensome to the State without any corresponding benefit to the public.

 Thus, our review of the public policy goals underlying the imposition of civil penalties in enforcing antitrust laws convinces us that the Legislature intended courts to have the authority to impose per diem civil penalties that may in the aggregate exceed $100,000 upon violators such as H & M.

## III

The trial court concluded that because of "certain conceptual and practical difficulties," it would not "attempt to assess the per diem penalty authorized by the statute even though a higher penalty might well on the facts of this case be more appropriate in terms of the magnitude of the offense." Specifically, the trial court discussed four reasons for its decision: (1) a greater penalty might be unconstitutional because it might be " 'so punitive either in purpose or effect to negate the civil label' " (quoting *In re Garay, supra,* 89 *N.J.* at 111); (2) a civil conspiracy may not be "continuous" for the purpose of imposing a per diem penalty; (3) it would be difficult to determine with certainty "the exact number of days" the conspiracy lasted; (4) federal law permits imposition of per diem penalties only after a court order has been violated. We disagree with the trial court's analysis and now address each of the court's concerns.

### 1. *Constitutionality of a Greater Penalty*

The trial court feared that a civil penalty greater than $100,-000 may be " 'so punitive either in purpose or effect to negate the civil label.' " If the per diem penalty in this case were considered a criminal penalty, it could violate the due process rights of H & M because the company did not receive the constitutional protections accorded to criminal defendants. *See United States v. Ward,* 448 *U.S.* 242, 248, 100 *S.Ct.* 2636, 2641,

65 *L.Ed.*2d 742, 749 (1980); *Kennedy v. Mendoza-Martinez*, 372 *U.S.* 144, 167, 83 *S.Ct.* 554, 567, 9 *L.Ed.*2d 644, 660 (1963).

■ The characterization of a penalty as criminal or civil is primarily a matter of statutory construction. *United States v. Ward, supra*, 448 *U.S.* at 248, 100 *S.Ct.* at 2641, 65 *L.Ed.*2d at 749; *In re Garay, supra*, 89 *N.J.* at 112. "Where the legislature has labelled the penalty civil, that expression of legislative purpose is accorded substantial weight." *Id.* Since the Antitrust Act provides a separate section governing criminal penalties, *N.J.S.A.* 56:9–11, immediately succeeding *N.J.S.A.* 56:9–10, the clear legislative purpose of *N.J.S.A.* 56:9–10c is to provide civil penalties. *See* Note, "New Jersey Antitrust Law: An Overview," 2 *Seton Hall Legis.J.* 134, 171 (1977) (monetary penalties under *N.J.S.A.* 56:9–10c constitute civil remedy). This characterization of the penalty will govern unless there is " 'the clearest proof' that the sanction is punitive either in purpose or effect." *In re Garay, supra*, 89 *N.J.* at 112, (quoting *United States v. Ward, supra*, 448 *U.S.* at 249, 100 *S.Ct.* at 2641, 65 *L.Ed.*2d at 749).

In determining whether the Legislature made the penalties of *N.J.S.A.* 56:9–10c so punitive as to transform them into criminal sanctions, we consider the following factors:

[1] Whether the sanction involves an affirmative disability or restraint, [2] whether it has historically been regarded as a punishment, [3] whether it comes into play only on a finding of scienter, [4] whether its operation will promote the traditional aims of punishment—retribution and deterrence, [5] whether the behavior to which it applies is already a crime, [6] whether an alternative purpose to which it may rationally be connected is assignable for it, and [7] whether it appears excessive in relation to the alternative purpose assigned. [*Kennedy v. Mendoza-Martinez, supra*, 372 *U.S.* at 168–69, 83 *S.Ct.* at 567–68, 9 *L.Ed.*2d at 661 (footnotes omitted).]

These factors are applied to the statute on its face. *Id.*

■ Applying these factors to this case, we find that there is no clear proof to overcome the Legislature's characterization of the per diem penalty as civil. On the contrary, the second, third, and fifth factors clearly indicate that the per diem penalty is civil. As to the second factor, monetary penalties have

historically been regarded as civil, not criminal, penalties. *United States v. Ward, supra,* 448 *U.S.* at 256, 100 *S.Ct.* at 2645, 65 *L.Ed.*2d at 754 (Blackmun, J., concurring); *cf. In re Garay, supra,* 89 *N.J.* at 112 (the United States Supreme Court has never rejected Congress' designation of a monetary penalty as civil). As to the third factor, the per diem penalty may be imposed without a finding of scienter. As to the fifth factor, the antitrust behavior to which the penalty applies is not already a crime because there has not been a finding that defendants "knowingly" violated the Act, a finding that is required for a criminal conviction under *N.J.S.A.* 56:9–11. Accordingly, we find that the per diem penalty provision is constitutional on its face.

■ Even though a civil penalty is constitutional on its face, its imposition in a given case may be so disproportionate to the harm caused by a defendant that the penalty is unreasonable. *In re Garay, supra,* 89 *N.J.* at 114–15. In the present case, the trial court did not determine that a penalty greater than $100,-000 would be unreasonable. To the contrary, the court noted that "a higher penalty might well on the facts of this case be more appropriate in terms of the magnitude of the offense; more telling in terms of the deterrent purposes of the act and more nearly proper to recompense plaintiff for the costs of the investigation and prosecution of the case."

## 2. *Civil Conspiracy as a Continuous Wrongful Act*

■ The trial court found that a civil conspiracy is not "continuous" for the purpose of imposing per diem penalties. Relying on cases holding that the gravamen of civil conspiracy is the underlying wrong that, absent conspiracy, would create a cause of action, *e.g., Lopez v. Swyer,* 62 *N.J.* 267 (1973), the trial court held that penalties should be imposed based on defendants' attempt to fix prices, not upon the duration of the conspiracy. The court believed that the conspirators should be liable only for their actual wrongful acts, i.e., for their bid-rig-

ging, but not for the period of time during which the conspiracy existed.

We are not persuaded by the trial court's analysis. The issue in the principal case relied upon by the court, *Lopez v. Swyer, supra,* 62 *N.J.* 267, was limited to whether the fact that defendants had conspired to conceal medical negligence should increase damages against them where they had already been held liable for the underlying wrong, *i.e.,* the negligent act. In this case, however, the conspiracy is itself the underlying wrong. *See State v. New Jersey Trade Waste Ass'n,* 96 *N.J.* 8, 19 (1984) ("No overt act need be charged in an antitrust indictment nor need any such acts be proved at trial."). The penalties imposed under the Act are designed to prevent not only wrongful acts committed pursuant to a conspiracy, but the conspiracy itself. *See N.J.S.A.* 56:9-3 ("Every ... conspiracy in restraint of trade ... shall be unlawful.").

The trial court's approach fails to recognize that an agreement to fix prices can affect the marketplace for many years and that per diem penalties are particularly well suited to deterring violations. As one court has said: "[e]ffective deterrence requires daily penalties for this type of violation, for without them potential violators might regard the statutory penalty 'as nothing more than an acceptable cost of the violation.'" *United States v. Phelps Dodge Indus. Inc., supra,* 589 *F.Supp.* at 1361 (quoting *United States v. ITT Continental Baking Co., supra,* 420 *U.S.* at 231, 95 *S.Ct.* at 932, 43 *L.Ed.*2d at 158).

Our analysis is consistent with federal court decisions holding that conspiracies to fix prices are "continuing" violations under the Federal Trade Commission Act. In *United States v. ITT Continental Baking Co., supra,* 420 *U.S.* at 231–32, 95 *S.Ct.* at 932, 43 *L.Ed.*2d at 158–59, the Supreme Court relied on the deterrent effect of daily penalties in holding that such penalties should be imposed on such "continuing" violations of a FTC order. The *ITT* holding has been followed by lower federal courts. *See United States v. Phelps Dodge Indus., Inc., su-*

*pra,* 589 *F.Supp.* at 1361 ("a conspiracy to maintain prices at an artificially inflated level is by its very nature an ongoing enterprise" that is subject to daily penalties); *Federal Trade Comm'n v. Consolidated Foods Corp.,* 396 *F.Supp.* 1353, 1356 (S.D.N.Y.1975) (conspiracies to fix prices "necessarily continue on a day-to-day basis until a specific act is taken in abatement.").

3. *Practical Difficulty in Assessing Per Diem Penalty*

■ Finding "much room for dispute" as to the specific date the conspiracy ended, the trial court held that there was no objective basis on which to assess a per diem penalty. We find that the court erred in assuming that it had to determine the exact duration of the conspiracy in order to impose a per diem penalty.

It is enough that the duration of the conspiracy be determined by a "fair and reasonable" estimate even though "[t]he imprecision of the [witnesses'] testimony makes it difficult to pin down the duration of the conspiracy." *United States v. Phelps Dodge Indus., Inc., supra,* 589 *F.Supp.* at 1362. The more successful a conspiracy has been, the more unlikely it is that the duration of the conspiracy can be determined with certainty. It is incompatible with the deterrent purposes of the Antitrust Act to reward a defendant because his actions made calculation of a fine difficult. *Cf. Bigelow v. RKO Radio Pictures, Inc.,* 327 *U.S.* 251, 264–65, 66 *S.Ct.* 574, 579–80, 90 *L.Ed.* 652, 660 (1946) (Antitrust damages under the Sherman Act can be determined by a "just and reasonable estimate" based upon "probable and inferential as well as upon direct and positive proof." "Any other rule would enable the wrongdoer to profit by his wrongdoing at the expense of his victim.") (citations omitted).

4. *Absence of Prior Court Orders*

■ Federal law allows the imposition of per diem penalties only where defendant has violated a court or administrative

order. *See* 15 *U.S.C.A.* § 21(*l*) (Clayton Act); 15 *U.S.C.A.* § 45(*l*) (Federal Trade Commission Act). Consequently, defendant argues, and the trial court agreed, that a per diem penalty cannot be imposed under the Act absent violation of a court order. We disagree.

The uniform construction provision of the Act mandates that the Act be construed in harmony with the federal cases interpreting *"comparable* [f]ederal antitrust statutes." *N.J.S.A.* 56:9–18 (emphasis supplied). The federal antitrust statutes specifically require a cease and desist order be issued and violated before civil penalties are imposed. *See* 15 *U.S.C.* §§ 21(*l*) and 45(*l*). Unlike the federal statutes, however, the Act does not require such an order to be issued and violated before the imposition of any civil penalty. *See N.J.S.A.* 56:9–10c. Since the Legislature clearly did not intend per diem penalties to apply only where a court order was violated, it would be a misconstruction of the Act to adopt that requirement.

## IV

As explained above, *N.J.S.A.* 56:9–10c does not mandate that any particular penalty be imposed for a given violation. Rather, the statute merely establishes the maximum penalty permissible and allows a court considerable discretion in determining the penalty appropriate in each case. *Kugler v. Koscot Interplanetary, Inc.,* 120 *N.J.Super.* 216, 250 (Ch.Div. 1972). Generally, a trial court's decision with respect to the amount of a penalty should not be overturned unless the court abused its discretion. In the present case, however, we find that the penalty imposed upon H & M must be reversed because the court's decision was based on a misinterpretation of applicable law that led the court mistakenly to conclude that per diem penalties could not be imposed in this case and that, in any event, no penalty in excess of $100,000 could be imposed on

H & M. *See United States v. ITT Continental Baking Co., supra,* 420 *U.S.* at 243, 95 *S.Ct.* at 938, 43 *L.Ed.*2d at 165.

 Since this is our first decision relating to the calculation of civil penalties under the Antitrust Act, we take this opportunity to delineate some of the factors that courts should consider in setting civil penalties under the Act.

(1) *The good or bad faith of defendant.* The court should consider the extent to which a defendant acted in good or bad faith. *See United States v. Phelps Dodge Indus., Inc., supra,* 589 *F.Supp.* at 1363; *United States v. Readers Digest Ass'n, Inc.,* 494 *F.Supp.* 770, 772 (D.Del.1980); *Federal Trade Comm'n v. Consolidated Foods Corp., supra,* 396 *F.Supp.* at 1356–57; *United States v. Swingline, Inc.,* 371 *F.Supp.* 37, 46 (E.D.N.Y.1974); *United States v. J.B. Williams Co., Inc.,* 354 *F.Supp.* 521, 548 (S.D.N.Y.1973), aff'd in part and rev'd in part, 498 *F.*2d 414 (2d Cir.1974). The Court should assess how egregious defendant's conduct was and whether defendant could have reasonably believed his conduct was legal.[4] In addition, the court should consider defendant's conduct when it learned that its prior actions might be illegal.

(2) *Defendant's ability to pay.* The greater a defendant's income and financial resources, the larger a penalty will have to be in order to deter unlawful behavior. As the trial court noted in the present case, "$100,000 is probably inadequate to deter a company the size of Henkels and McCoy, which experienced a gross profit of over $44,000,000 in 1982, from further violations of the law." Federal courts have consistently recognized a

---

[4]Some types of conduct, such as price fixing, are per se violations of the Antitrust Act because of their inherent tendency to eliminate competition. *Pomanowski v. Monmouth County Bd. of Realtors,* 89 *N.J.* 306, 311 (1982). Other restraints of trade are evaluated under a "rule of reason" test. Under that test defendants' conduct "is evaluated to determine whether it in fact causes significant harm relative to the business justification." *Id.* Thus, it is possible that a defendant acted in good faith when it adopted a mode of conduct ultimately ruled unlawful under a "rule of reason test."

defendant's ability to pay as a factor in determining appropriate per diem penalties under the Federal Trade Commission Act. *See United States v. Readers Digest Ass'n, Inc., supra,* 494 *F.Supp.* at 772; *Federal Trade Comm'n v. Consolidated Foods Corp., supra,* 396 *F.Supp.* at 1357; *United States v. Swingline, Inc., supra,* 371 *F.Supp.* at 46; *United States v. J.B. Williams Co., Inc., supra,* 354 *F.Supp.* at 548.

(3) *Amount of profits obtained from illegal activity.* The greater the profits a defendant is likely to obtain from illegal conduct, the greater the penalty must be if penalties are to be a deterrent. As the court said in *United States v. Reader's Digest Ass'n, supra,* 494 *F.Supp.* at 779 (quoting *United States v. ITT Continental Baking Co., supra,* 420 *U.S.* at 231–32, 95 *S.Ct.* at 932, 45 *L.Ed.*2d at 158–59), a "civil penalty should be more than a mere 'license fee' or 'an acceptable cost of violation'" of the law. Conversely, the penalty may not be so disproportionate to the harm caused by a defendant that the penalty becomes unreasonable. *In re Garay, supra,* 89 *N.J.* at 113–14. The federal courts have considered the amount of illegal profits in setting penalties under the Federal Trade Commission Act. *See Federal Trade Comm'n v. Consolidated Foods Corp., supra,* 396 *F.Supp.* at 1357; *United States v. Swingline, Inc., supra,* 371 *F.Supp.* at 46.

(4) *Injury to the public.* When imposing civil penalties under the Federal Trade Commission Act, the federal courts have consistently considered the injury caused to the public by defendant's illegal conduct. *See United States v. Readers Digest Ass'n Inc., supra,* 494 *F.Supp.* at 772; *Federal Trade Comm'n v. Consolidated Foods Corp., supra,* 396 *F.Supp.* at 1357; *United States v. Swingline Inc., supra,* 371 *F.Supp.* at 46; *United States v. J.B. Williams Co., Inc., supra,* 354 *F.Supp.* at 548. While injury to the public may sometimes be equivalent to the profits obtained by the defendant through its illegal conduct, *see United States v. Papercraft Corp.,* 540 *F.*2d 131, 141 (3rd Cir.1976), the court should be free to consider less tangible forms of harm.

(5) *Duration of the conspiracy.* One of the reasons that per diem penalties are appropriate for antitrust violations is that the effects of a conspiracy are continuing and its effects "could be terminated or minimized by the violator at some time after initiating the violation." *United States v. ITT Continental Baking Co., supra,* 420 *U.S.* at 232, 95 *S.Ct.* at 932, 43 *L.Ed.*2d at 159. If the penalty for entering into a conspiracy remains the same regardless of how long the conspiracy lasts, a violator will have less incentive to end it. If, however, penalties mount the longer a conspiracy remains in effect, a violator will have a greater incentive to end it.

(6) *Existence of criminal or treble damages actions.* The court should consider whether the conduct underlying the civil action also has given rise to a criminal action under *N.J.S.A.* 56:9–11 or a treble damages action under *N.J.S.A.* 56:9–12. A large civil penalty may be unduly punitive if other sanctions have been imposed for the same violation of the Antitrust Act.

(7) *Past violations.* The court should take into consideration whether the defendant has violated the Antitrust Act on prior occasions. If past penalties have been insufficient to deter him or her from illegal activity, this factor weighs strongly in favor of greater penalties. *See United States v. H.M. Prince Textiles, Inc.,* 262 *F.Supp.* 383, 389 (S.D.N.Y.1966) (defendant's prior business record to be considered in setting civil penalties under the Federal Trade Commission Act).

The weight to be given to each of these factors by a trial court in determining whether a lump sum or per diem penalty should apply, and the amount of any such penalty, will depend on the facts of each case. In this case, we find that the record does not provide a sufficient factual basis to apply these factors. Consequently, we remand this matter to the trial court so that it can hold a hearing limited solely to the issue of what penalties should be imposed. We trust that the court will

consider the factors outlined above, as well as any other factors it deems proper, to arrive at an appropriate penalty.[5]

Accordingly, the judgment of the Appellate Division as to the imposition of penalties is reversed.

*For reversal in part and remandment*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, O'HERN, GARIBALDI and STEIN—6.

*Opposed*—None.

---

[5]We note, however, that this seems to be an appropriate case for the imposition of a per diem penalty. Federal courts have consistently found such penalties appropriate where (1) the detrimental effect to the public and the advantage to the violator continue over time, and (2) the violator could eliminate the effects of the violation if it were motivated to do so. *See, e.g., United States v. Phelps Dodge Indus., Inc., supra,* 589 *F.Supp.* at 1360–61; *Federal Trade Comm'n v. Consolidated Foods Corp., supra,* 396 *F.Supp.* at 1356. The antitrust violations in this case appear to possess the above characteristics. First, except perhaps during the hiatus, the bid-rigging and the market allocation occurred continuously over approximately a 12–year period, and defendants' control over the market probably became stronger with time during this period. Second, defendants could certainly have eliminated the effects of their violations by simply discontinuing their bid-rigging and market allocation.