**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5327-17T4

MARLENE CARIDE,
COMMISSIONER,
NEW JERSEY DEPARTMENT
OF BANKING AND
INSURANCE,

       Petitioner-Respondent,

v.

RANDOLPH A. FISHER, JR.,
KEVIN G. MADDEN and REGAL
FINANCIAL GROUP, LLC,

       Respondents-Appellants.

_____

       Argued September 16, 2019 – Decided October 2, 2019

       Before Judges Sabatino and Geiger.

       On appeal from the New Jersey Department of Banking and Insurance, Agency Docket No. OTSC E16-12.

       Richard Daniel DeVita argued the cause for appellants (DeVita & Associates, attorneys; Richard Daniel DeVita, on the briefs).

Ryan Shawn Schaffer, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Melissa H. Raksa, Assistant Attorney General, of counsel; Ryan Shawn Schaffer, on the brief).

PER CURIAM

Appellants Randolph A. Fisher, Jr., Kevin G. Madden, and Regal Financial Group, LLC (Regal) appeal from the final agency decision of the Commissioner of the Department of Banking and Insurance (the Department) imposing monetary penalties and revoking Fisher and Regal's insurance-producer licenses, for violating the New Jersey Insurance Producer Licensing Act of 2001 (IPLA), N.J.S.A. 17:22A-26 to -57, and related regulations. We affirm.

I.

Fisher and Madden were each fifty-percent owners of Regal. In October 2006, Fisher and Madden, on behalf of Regal, began to promote and sell an investment plan offered by National Foundation of America (NFOA), a Tennessee corporation not registered to do business, or authorized to sell insurance, in New Jersey. Fisher and Madden collectively met with four sets of prospective purchasers: J.K. and M.K., W.B., G.B. and M.B., and D.C.[1] Each

---

[1] We use initials to protect the privacy of the purchasers.

prospective purchaser was over eighty years old and planned using lifetime savings to purchase the plans. All four sets of clients signed an NFOA installment plan agreement. NFOA's application for 26 U.S.C. § 501(c)(3) status as a nonprofit charitable organization was pending before the Internal Revenue Service (IRS) when the meetings took place.

In May 2007, the Tennessee Commissioner of Commerce and Insurance (Tennessee Commissioner) notified the Department of a pending investigation of NFOA. In July 2007, a Tennessee court entered an order appointing the Tennessee Commissioner as a receiver of NFOA. That same month, a court-appointed special deputy receiver requested and received reimbursement from Regal of all commissions associated with the sale of the NFOA investment plans. The refunded commissions totaled $37,489.75. In March 2013, Richard Olive, the president of NFOA, was convicted in federal court of mail fraud, wire fraud, and money laundering. He was sentenced to a thirty-one-year prison term and ordered to pay nearly $6,000,000 in restitution to approximately 190 NFOA plan purchasers.

In January 2011, the Department of Enforcement at the Financial Industry Regulatory Authority (FINRA) filed a disciplinary proceeding against Fisher relating to his sale of NFOA investment plans. In March 2012, FINRA issued

an order accepting an offer of settlement that suspended Fisher from associating with FINRA members for six months and required him to pay a $15,000 fine and restitution totaling $47,258.90.

The Department asserted Fisher, Regal, and Madden violated IPLA and related regulations. Among other things, it claimed Fisher failed to conduct adequate due diligence prior to recommending the purchase of NFOA investment plans to the four sets of Regal's clients. The Department contended the NFOA product was always "too good to be true," adequate investigation would have revealed NFOA was not granted Section 501(c)(3) status, and NFOA was not authorized to sell insurance products in New Jersey. The Department alleged presenting the product as investment-worthy amounted to misrepresentation that harmed the elderly purchasers.

In February 2016, the Department issued a seventeen-count order to show cause (OTSC), which sought to revoke appellants' insurance produce licenses and impose civil monetary penalties for conduct violating IPLA and related regulations. More specifically, counts one, four, seven, and ten alleged Fisher and Regal breached their fiduciary duty by selling NFOA installment plans to the victims at a time when it was not approved as a charitable non-profit organization by the IRS.

Count two, five, eight, and eleven alleged Fisher and Regal presented untrue, deceptive, and misleading information to the purchasers in violation of various statutory provisions. Counts three, six, nine, and twelve alleged Fisher and Regal acted as an agent for or represented an insurer not authorized to transact insurance in New Jersey.

Count thirteen alleged Fisher failed to timely report the FINRA disciplinary proceeding to the Department. Count fourteen alleged Fisher failed to timely notify the Department of the FINRA settlement order. Count fifteen alleged Fisher did not timely provide a statement to the Department describing his involvement with NFOA. Count sixteen alleged Fisher did not timely provide a statement to the Department describing his annuity solicitation and sales.

Count seventeen alleged Madden, as designated responsible licensed producer for Regal, failed to properly supervise Fisher and Regal's insurance-related conduct, in violation of N.J.S.A. 17:22A-40(a)(2) and N.J.A.C. 11:17A-1.6(c).

Appellants disputed the charges, so the Department transmitted the matter to the Office of Administrative Law as a contested case. The Administrative Law Judge (ALJ) denied the Department's motion for summary decision,

proceeded to conduct a two-day hearing, and issued a twenty-nine page Initial Decision.

The ALJ characterized the "thrust of the dispute" as whether "Fisher conducted adequate due diligence prior to suggesting the NFOA product to four clients, and how much harm, if any, was done." The Department contended proper investigation would have revealed the investment plans were always "too good to be true," and Fisher, Regal, and Madden's conduct harmed elderly clients.

Appellants argued they had researched NFOA, made reasonably prudent choices, the investment plan was offered to only four clients to meet their specific financial challenges, two clients received benefits they could not have received elsewhere, and the other two clients sustained no harm. Fisher pointed out that even though the IRS never approved Section 501(c)(3) charitable status for NFOA, J.K. and M.K. actually received $30,000 in income tax benefits in 2006 and 2007. In addition, the timing of customers' sales of General Electric stock to fund the NFOA purchase was highly favorable because, shortly thereafter, the value of the stock plummeted sixty percent and never recovered.

As to counts one, two, and three, involving sales to J.K. and M.K., the ALJ found, based on the exhibits and "Fisher's credible testimony," that "Fisher

did conduct some research on the NFOA, which at the time appeared to have both a legitimate Tennessee incorporation and pending charity application at the IRS." The ALJ further found the IRS did not warn Fisher "that the charitable-donation tax benefit would be yanked away from his client for the time it was pending and not approved, and, indeed, it was not. For two tax years, J.K. and M.K. were allowed to take the charitable deduction." The ALJ also found talking to a NFOA competitor was a legitimate investigation technique. In addition, the tax benefit and two liquidation payments left J.K. and M.K. whole, even before FINRA added the restitution payment.

Notwithstanding these findings, the ALJ concluded that "on the company side of [NFOA's] ledger, the plan made no financial sense." The plan "involved three ways for the NFOA to lose money, with no compelling explanation of how it could turn a profit, which is why it wound up in receivership. By its nature, [the plan] was risky, and the Department's position is that insurance is not risky." The ALJ stated, "selling what turns out to be a fraudulent product is at least incompetent if not itself a fraudulent act." The ALJ determined the Department proved selling NFOA plans "violated the prohibition against incompetence and, in turn, against breaking the insurance laws." Selling a product that was "too good to be true" breached the fiduciary duty owed to prospective purchasers.

A-5327-17T4

As to counts four, five, and six, involving the sale to W.B., the ALJ found Fisher presented a plan that would return $111,770.78 over ten years for an investment of $111,258.05. It would also yield a tax deduction of $43,312, resulting in tax savings of $10,828. This reduced W.B.'s gross income enough to maintain her eligibility for Pharmaceutical Assistance to the Aged and Disabled (PAAD) benefits. W.B. received an $18,000 payment from NFOA in 2007, and payments totaling $80,585.97 from the bankruptcy receiver, for a total of $98,585.97. The value of an annuity that was transferred to NFOA was $122,351.02. The 2012 FINRA settlement required Fisher to repay $15,896.25 to W.B. Thus, W.B. "was still out $15,896.25 from her original annuity" until the FINRA settlement payment was made.

As to counts seven, eight, and nine, involving G.B. and M.B., the ALJ found the Department made the same set of allegations against Fisher and Regal as raised in the previous counts. G.B. and M.B. signed a contract with NFOA to transfer $108,161.26 from an insurance policy in return for deferred payments beginning in May 2022. "However, the shutdown of the NFOA occurred before any funds were transferred, so no financial loss was sustained by" G.B. and M.B. The ALJ found the Department proved all three counts.

The ALJ noted counts ten, eleven, and twelve, involving D.C., "repeat the allegations of breach of fiduciary duty, providing untrue and misleading information, and representing an insurer not authorized to transact such insurance in New Jersey." The ALJ found in favor of the Department.

The ALJ determined the Department had not proven counts thirteen, fourteen, fifteen, and sixteen by a preponderance of the evidence.

Count seventeen alleged Madden failed to properly supervise Fisher and Regal. Based on Madden's credible testimony, the ALJ found that Fisher and Madden "offered the NFOA plan only after W.B. had turned down two other ideas; that Madden relied on Fisher's accurate representation that [NFOA] was licensed as a Tennessee corporation, . . . had an IRS charitable-tax status application pending[,] and that Fisher had made attempts at other confirmation." The ALJ also found "Madden directly participated in the recommendation of the product without conducting independent due diligence on it." The ALJ concluded the Department proved Madden failed to properly supervise Regal and was vicariously liable for the acts of its partners, officers, and directors.

The ALJ then considered the seven Kimmelman[2] factors with respect to imposing a penalty.  She concluded "Fisher erred, but his mistake did not rise to bad faith."  His ability to pay monetary penalties was "very limited" based on his 2015 income tax return.  Fisher realized no profit from the sales because the commissions were repaid to NFOA in 2007.  As to injury to the public, the ALJ found "the public is harmed when faith in the insurance markets is damaged by illegal activity."  The duration of the improper conduct was only five months.  The case did not involve criminal activity by Fisher, Regal, or Madden.  FINRA imposed a $47,258.90 restitution obligation, a $15,000 fine, and a six-month suspension against Fisher.  Madden was not named in the FINRA proceeding.  Fisher, Regal, and Madden had no past violations.

The ALJ recommended imposing an aggregate $4000 monetary penalty on counts one, four, seven, and ten; an aggregate $6000 monetary penalty on counts two, five, eight, and eleven; a $500 monetary penalty on count two; an

---

[2]  Kimmelman v. Henkels & McCoy Inc., 108 N.J. 123, 137-39 (1987).  The Kimmelman factors may be summarized as follows:  (1) the good or bad faith of the defendant, (2) the defendant's ability to pay, (3) the amount of profits defendant gained as a result of the illegal activity, (4) the injury to the public, (5) the duration of the conspiracy or scheme, (6) whether criminal or treble damages actions have been filed, and whether "[a] large civil penalty may be unduly punitive if other sanctions have been imposed for the same violation of the [same statute]," and (7) whether past violations occurred. Id. at 137-40.

A-5327-17T4

aggregate $400 monetary penalty on counts three, six, nine, and twelve; and a $2000 monetary penalty on count 17. Fisher and Regal were made jointly and severally liable for the monetary penalties on counts one through twelve, totaling $10,900. Madden was made individually liable for the $2000 monetary penalty on count seventeen. Finally, the ALJ concluded license revocation was not warranted, and license suspension should be imposed only if Fisher, Regal, or Madden "fail to comply with the payment of penalties within a reasonable time."

The Department filed written exceptions to the ALJ's Initial Decision regarding proof of certain allegations, the amount of the monetary penalties imposed, and the determination not to revoke or suspend Fisher's insurance producer license. Appellants opposed those exceptions, but did not seek to overturn the ALJ's recommendations.

The Commissioner adopted the findings that the Department met its burden of proof as to counts one through twelve and seventeen but not counts fifteen and sixteen. The Commissioner rejected the finding that the Department failed to prove counts thirteen and fourteen.

Count thirteen alleged Fisher failed to timely notify the Department of the FINRA disciplinary proceeding in violation of N.J.S.A. 17:22A-47(c). The

11

statute also requires the notification to "include a copy of the order, consent order or other relevant legal documents." Ibid. The Commissioner found the Department had no record of any such notification and Fisher "failed to provide any written communication to the Department as proof that he complied with the notification requirement." The Commissioner also concluded that any purported oral notification is insufficient to satisfy the reporting requirement.

Similarly, count fourteen alleges Fisher violated N.J.S.A. 17:22A-40(a)(19) by failing to timely notify the Department of the disposition of the FINRA disciplinary proceedings and the March 2012 settlement order. The Commissioner noted the Department had no record of such notification and Fisher "failed to provide any written communication to the Department as proof that he complied with the notification requirement." Although she found the record unclear whether oral notification was provided, the Commissioner again concluded oral notification did not satisfy the reporting requirement.

The Commissioner then considered the sanctions to be imposed. She first addressed the appropriate monetary penalties to be imposed by application of the Kimmelman factors.

As to the first factor, addressing the good or bad faith of the violator, the Commissioner noted that under the IPLA, "bad faith need not be proven by

actual intent or malice because the Act does not require proof of intent. Moreover, after the fact attempts to 'cure' the results of the improper conduct are not dispositive." (Citations omitted). The Commissioner emphasized the following findings by the ALJ:

> Fisher, as an experienced insurance producer, did not reasonably conduct due diligence regarding the NFOA or their product prior to recommending it to his elderly clients. These elderly clients, upon Fisher's recommendation, took their life savings from legitimate insurance products and transferred those monies to a company that had not been properly vetted, despite numerous "red flags," jeopardizing their financial futures.

The Commissioner rejected applying the so-called "rule of reason" test, because it "should not be applied in consumer protection oriented cases where noncompliance would directly injure the public and is only appropriate in matters that are inherently business or competition oriented." The Commissioner noted, "producer misconduct—like selling impermissible insurance products that cannot provide the benefits promised elderly clients— can directly injure consumers." The Commissioner concluded the "rule of reason" test should not be applied to licensed insurance producers because they "are held to a higher standard of conduct." The Commissioner found appellants "did not conduct sufficient due diligence into the legitimacy or legality of this

13

product or the NFOA as was their duty as licensed insurance producers under the insurance laws of this State." Although the Commissioner found that appellants' "cooperation with regulatory bodies and repayment of commissions after the fact is commendable, it does not excuse their reckless behavior, nor does it demonstrate that [their] actions were not undertaken in bad faith." The Commissioner found "Fisher and Regal's conduct rose to bad faith and that this factor weighs in favor of a significant monetary penalty."

As to the second factor, the Commissioner agreed with the ALJ that Fisher provided proof of a limited ability to pay fines. She noted, however, that "an insurance producer's ability to pay is only a single factor to be considered in determining an appropriate fine and does not obviate the need for the imposition of an otherwise appropriate monetary penalty."

The third factor addresses the amount of profits obtained or likely to be obtained from the unlawful conduct. The Commissioner noted the penalty must be proportional to the potential profits resulting from the illegal conduct to have a deterrent effect, citing Kimmelman, 108 N.J. at 138. She found the commissions would have been far higher than the $37,489.75 stated in the Initial Decision if the Tennessee regulatory authorities did not intercede. Absent such intervention, "there is no evidence that Fisher and Regal would have stopped

recommending this product to their clients." The Commissioner found this weighed in favor of a significant monetary penalty.

The fourth factor addresses injury to the public. The Commissioner emphasized that licensed producers are fiduciaries. The Commissioner must "protect the public welfare" and "instill public confidence in both insurance producers and the insurance industry." "[T]he public's confidence in a producer's honesty, trustworthiness and integrity is of paramount concern." Breach of fiduciary duties, fraudulent conduct, and unfair trade practices financially harm insurance consumers and erode public confidence in the insurance industry. The Commissioner determined a significant monetary penalty was warranted because Fisher and Regal's conduct resulted in a substantial harm to their clients and the public.

"Fisher's reckless incompetence put his clients in jeopardy of losing their life savings and deprived his clients of their ability to use their money as they saw fit. When his clients were repaid, they were not made whole for several years and were repaid without interest." The Commissioner found Fisher and Regal's conduct harmed their elderly clients, the public's confidence in insurance producers, and the public's perception of the profession as a whole. She found this factor weighed heavily in favor of a significant penalty.

The fifth factor addresses the duration of the misconduct. The Commissioner found appellants' conduct was of relatively short duration, occurring during five nonconsecutive months spread over two years.

The sixth factor addresses criminal penalties and other sanctions imposed against the violator. Here, appellants were not criminally prosecuted. The Commissioner determined that the $15,000 fine, $47,258.90 in restitution, and a six-month suspension imposed by FINRA did not weigh in favor of mitigation or negate the need for a substantial monetary penalty.

The seventh factor concerns prior violations. The Commissioner agreed with the ALJ that appellants had no past violations. Thus, this factor weighed in favor of mitigation.

Based on this analysis of the Kimmelman factors, the Commissioner determined that the nature of appellants' violations warranted substantially higher monetary penalties than those imposed by the ALJ. The Commissioner increased the aggregate penalty assessment on counts one through twelve to $60,000 against Fisher and Regal, for which they were jointly and severally liable. She imposed an aggregate $5000 penalty against Fisher individually on

16

counts thirteen and fourteen. The penalty against Madden on count seventeen was increased from $2000 to $5000.[3]

The Commissioner concluded the record compelled the revocation of Fisher's producer license. She found his "pattern of misrepresentation" related to over $800,000 in sales of annuities to senior citizens over eighty years old. Fisher induced four clients "to divest their life savings from legitimate financial products and invest that money in a product that Fisher had failed to vet prior to his recommendation." He promoted a product that "he should have known" was "too good to be true," yet "was not troubled enough by these enchanted promises to investigate any further." He solicited sales of "an annuity without knowing what it was he was selling to his elderly clients." His misconduct only ceased upon intervention by Tennessee regulatory authorities. His misbehavior was aggravated by his sale of products that were not permitted to be sold in New Jersey by an insurer that was not permitted to do business in this State. Fisher's testimony "indicates that he did not concern himself with the ramifications of recommending elderly clients to invest in a product that could jeopardize their

---

[3] Appellants have not briefed the issue of the sanctions imposed against Madden. We have authority to deem the issue waived. See Sklodowsky v. Lushis, 417 N.J. Super. 648, 657 (App. Div. 2011) ("An issue not briefed on appeal is deemed waived."). In any event, based on the record and the applicable law, we discern no reason to disturb the sanctions against him, either.

life savings." The Commissioner determined Fisher's breach of trust and fiduciary duties through "gross incompetence" "constitut[ed] a gross deviation from the standard of care required of insurance producers."

The Commissioner also found revocation of Regal's insurance producer license was appropriate, since it was vicariously liable for Fisher's actions under N.J.S.A. 17:22A-40(c).

This appeal followed. Appellants argue: (1) the penalties imposed are so punitive and disproportionate to the offenses as to shock the sense of fairness and reasonableness; (2) the penalty of revocation is at odds with the trial testimony and exhibits, appellants' clean record, the ALJ's findings and decision, case law, and other enforcement actions and settlements; and (3) the final decision misapplied the Kimmelman factors.

## II.

Established precedents guide our task on appeal. Our scope of review of an administrative agency's final determination is limited. In re Herrmann, 192 N.J. 19, 27 (2007). "A strong presumption of reasonableness attaches to the actions of administrative agencies." In re Vey, 272 N.J. Super. 199, 205 (App. Div.1993), aff'd, 135 N.J. 306 (1994). The burden is upon the appellant to demonstrate grounds for reversal. McGowan v. N.J. State Parole Bd., 347 N.J.

Super. 544, 563 (App. Div. 2002).  "However, we are not bound by the agency's interpretation of a statute or resolution of a question of law."  In re Carroll, 339 N.J. Super. 429, 437 (App. Div. 2001) (citing In re Taylor, 158 N.J. 644, 658 (1999)).

Thus, we will "not disturb an administrative agency's determinations or findings unless there is a clear showing that (1) the agency did not follow the law; (2) the decision was arbitrary, capricious, or unreasonable; or (3) the decision was not supported by substantial evidence."  In re Application of Virtua-West Jersey Hosp. Voorhees, 194 N.J. 413, 422 (2008).

An agency has "broad discretion in determining the sanctions to be imposed for a violation of the legislation it is charged with administering."  In re Scioscia, 216 N.J. Super. 644, 660 (App. Div. 1987) (citation omitted).  It is not our place to second-guess or substitute our judgment for that of the agency and, therefore, we do not "engage in an independent assessment of the evidence as if [we] were the court of first instance."  Taylor, 158 N.J. at 656 (quoting State v. Locurto, 157 N.J. 463, 471 (1999)).  An appellate court "may not vacate an agency determination because of doubts as to its wisdom or because the record may support more than one result," but it is "obliged to give due deference to the view of those charged with the responsibility of implementing legislative

programs." In re N.J. Pinelands Comm'n Resolution, 356 N.J. Super. 363, 372 (App. Div. 2003).

Applying these principles, we discern no basis for disturbing the Commissioner's reasoned determination. We affirm substantially for the reasons set forth in the Commissioner's comprehensive written decision. We add the following comments.

The Commissioner's power to impose sanctions is broad in scope. The Commissioner has the discretion to "place on probation, suspend, revoke, or refuse to issue or renew an insurance producer's license or may levy a civil penalty," N.J.S.A. 17:22A-40(a), "not exceeding $5000 for the first offense, and not exceeding $10,000 for each subsequent offense," N.J.S.A. 17:22A-45(c). Such sanctions are properly imposed, in part, to deter similar conduct in the future by the violator and those similarly situated. Sanctions serve to protect consumers from conduct that violates the fiduciary obligations, high standards, and expertise required of insurance producers.

Our deferential standard for reviewing agency actions "applies to the review of disciplinary sanctions as well." Herrmann, 192 N.J. at 28. Thus, our "review of an agency's choice of sanction is limited." In re License Issued to Zahl, 186 N.J. 341, 353 (2006). "Deference is appropriate because of the

'expertise and superior knowledge' of agencies in their specialized fields and because agencies are executive actors[.]" Ibid. (citations omitted) (quoting Greenwood v. State Police Training Ctr., 127 N.J. 500, 513 (1992)). A reviewing court:

> will modify a sanction only when necessary to bring the agency's action into conformity with its delegated authority. The [c]ourt has no power to act independently as an administrative tribunal or to substitute its judgment for that of the agency. It can interpose its views only where it is satisfied that the agency has mistakenly exercised its discretion or misperceived its own statutory authority.
>
> [Id. at 353-54 (quoting In re Polk License Revocation, 90 N.J. 550, 578 (1982)).]

We review administrative sanctions to determine "whether such punishment is so disproportionate to the offense, in light of all the circumstances, as to be shocking to one's sense of fairness." Herrmann, 192 N.J. at 28-29 (quoting Polk, 90 N.J. at 578).

Applying those principles of deference to the facts in this case, we hold the Commissioner was within the bounds of her statutory authority and discretion by imposing the civil penalties and license revocations.

The Commissioner found appellants breached the fiduciary duty they owed to their clients through their reckless and incompetent conduct. They sold

expensive fraudulent investment plans to their elderly clients without conducting even rudimentary investigation of NFOA, a company that had not received Section 501(c)(3) approval from the IRS and was not authorized to sell the investment plan in New Jersey. This placed their clients at risk of suffering an $800,000 loss of lifetime savings upon which they depended for financial security. While the commissions were refunded, it took years for the restitution to be paid, which did not include interest.

The Commissioner noted that an insurance producer's "honesty, trustworthiness and integrity are of paramount concern, since an insurance producer acts as a fiduciary to both the consumers and insurers they represent." Consequently, "a producer is held to a high standard of conduct." The Commissioner found Fisher "engaged in a pattern of misrepresentation related to sales of annuities to senior citizens amounting to just over $800,000 over the course of five months." The Commissioner noted his sales of the fraudulent plans only ceased upon notification by Tennessee regulators that NFOA was under investigation.

The Commissioner may revoke a producer's license for any violation of IPLA. N.J.S.A. 17:22A-40(a). Thus, revocation may be based on conduct other than fraud, such as "incompetence, untrustworthiness or financial

irresponsibility in the conduct of insurance business."   N.J.S.A. 17:22A-40(a)(8).

The Commissioner found that revocation of Fisher's producer license was appropriate and necessary due to "Fisher's breach of his fiduciary duties through his gross incompetence" that "constitutes a gross deviation from the standard of care required of insurance producers in this State."   The Commissioner concluded "the egregiousness of [Fisher's] misconduct [was] aggravated by his sale of products that were not permitted for sale in New Jersey and from an unauthorized insurer that was not permitted to do business in New Jersey." Those findings and conclusions are fully supported by the record.

Pursuant to N.J.S.A. 17:22A-40(c), Regal is vicariously liable for the actions and inactions of Fisher and Madden, its sole members and owners.  The Commissioner found Fisher's conduct and Madden's failure to supervise the actions of Fisher and Regal, made it necessary and appropriate to revoke Regal's producer license.  We find no basis to disturb that finding.

Appellants contend the Commissioner erred by not expressly considering the Kimmelman factors in determining license revocation was warranted.  We disagree.   Kimmelman involved per diem monetary penalties, not license suspension or revocation.  The Kimmelman factors are utilized in determining

whether any particular fine is appropriate, not to determine if an insurance producer's license should be suspended or revoked. See Kimmelman, 108 N.J. at 137 (noting it was the Court's "first decision relating to the calculation of civil penalties" and "delineat[ing] some of the factors that courts should consider in setting civil penalties"). Appellants provide no published precedent to the contrary. In any event, even if the Kimmelman factors were legally pertinent to licensure suspension and revocation issues, much of the analysis of those factors in the Commissioner's decision logically and substantially pertain to the non-monetary sanctions in this case.

Finally, Fisher and Regal argue the fines imposed were excessive.[4] We disagree.

Administrative penalties "must be tested for reasonableness as applied to the specific facts involved." In re Garay, 89 N.J. 104, 115 (1982). Aside from consideration of the Kimmeman factors, the Commissioner may also consider the need for deterrence when determining the appropriate monetary penalty. Kimmelman, 108 N.J. at 129; In re Midland Ins., 167 N.J. Super. 237, 256 (App. Div. 1979).

---

[4] As we have already noted, appellants did not brief the alleged excessiveness of the monetary penalty imposed on Madden. See supra note 3.

The insurance industry uniquely affects the public interest and the Commissioner is charged with the duty to protect the public welfare. See, e.g., Sheeran v. Nationwide Mut. Ins., 80 N.J. 548, 559 (1979). Civil monetary penalties are an effective enforcement device that "deter future unlawful behavior by the [violator] and those similarly situated." Kimmelman, 108 N.J. at 129 (citing Colin S. Diver, The Assessment and Mitigation of Civil Money Penalties by Federal Administrative Agencies, 79 Colum. L. Rev. 1435, 1456 (1979)).

The Commissioner carefully considered and weighed each of the Kimmelman factors and determined appellants should pay a substantial monetary penalty for each violation they committed. The Commissioner's findings were based upon substantial, credible evidence in the record. With all due respect to the ALJ's evaluation of sanctions, the Commissioner has the final word as regulator and did not misapply her authority in strengthening them. Although these were appellants' first violations, they jeopardized the lifetime savings of elderly investors through purchasing investment plans that were nothing more than part of a large scale Ponzi scheme. The decision to impose substantial monetary sanctions was reasonable given the nature of the violations,

A-5327-17T4

the magnitude of the investments involved, and the need for deterrence.[5]  We discern no abuse of discretion.

In sum, the Commissioner's final decision is consistent with the law and was not arbitrary, capricious, or unreasonable.  The monetary sanctions and license revocations were statutorily authorized and are not "shocking to [our] sense of fairness."  Herrmann, 192 N.J. at 29 (quoting Polk, 90 N.J. at 578).  We therefore affirm the revocation of Fisher and Regal's insurance producer licenses and the monetary penalties imposed.

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

---

[5]  In their brief, appellants refer to the Department's settlement offer they had rejected in support of their argument that the sanctions were excessive or unduly punitive.  Settlement offers do not constitute an admission and are not admissible.  N.J.A.C. 1:1-15.10.  Disclosing a settlement offer in an appellate brief is ordinarily "highly inappropriate."  Vastano v. Algeier, 178 N.J. 230, 242 (2003) (citing N.J.R.E. 408).  Accordingly, we do not consider the settlement offer.

A-5327-17T4