**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2797-19

MARLENE CARIDE,
COMMISSIONER, NEW
JERSEY DEPARTMENT OF
BANKING AND INSURANCE,

     Petitioner-Respondent,

v.

ANDREW TEPEDINO,

     Respondent,

and,

MICHAEL TEPEDINO &
SONS INSURANCE AGENCY,

     Respondent-Appellant.

_____

Submitted October 28, 2021 – Decided November 18, 2021

Before Judges Whipple and Geiger.

On appeal from the New Jersey Department of Banking and Insurance, Docket No. OTSC #E17-57.

Christopher Gillin-Schwartz, attorney for appellant.

Andrew J. Bruck, Acting Attorney General, attorney for respondent (Melissa H. Raksa, Assistant Attorney General, of counsel; Jeffrey S. Posta, Deputy Attorney General, on the brief).

PER CURIAM

Appellant Michael Tepedino & Sons Insurance Agency (MTS) appeals from a January 27, 2020 final decision and order of the Commissioner of the New Jersey Department of Banking and Insurance (Department), which held MTS vicariously liable for Andrew Tepedino's (Tepedino) fraudulent conduct violating several statutes and regulations; imposed civil monetary penalties and a statutory surcharge; awarded statutory attorney's fees; and revoked Tepedino's insurance producer license. We affirm.

We derive the following facts from the record. MTS primarily sells property and casualty insurance and is owned by Michael Tepedino. During the period relevant to this matter, Andrew Tepedino (who is Michael Tepedino's son) was a licensed resident insurance producer and had an office inside the agency. Tepedino used MTS's bank accounts, telephones, reception staff, letterhead, mailing address, fax machine, and reference number. He worked under an employment contract for MTS to sell car insurance prior to 2012 but did not have an active contract with the agency in 2012.

From January 2009 to May 30, 2011, MTS contracted with Midland National Life Insurance Company (Midland) to sell annuity products. Tepedino was the only person at MTS that sold annuities. On May 31, 2011, Midland and Tepedino began to contract directly.

Before September 25, 2012, Tepedino met with J.S., an eighty-one-year-old man who owned annuities through a separate life insurance company. On September 25, 2012, Tepedino attempted to sell annuities to J.S. and fabricated several aspects of the application to receive a substantial commission. To that end, Tepedino used MTS's fax machine and reference number to submit annuity forms to Midland on behalf of J.S. The annuity forms falsely stated J.S.'s household income, expenses, disposable income, net worth, and real estate holdings. Other forms submitted for the same purpose contained an incorrect Social Security number, address, phone number, and date of birth for J.S. They also contained false statements regarding J.S.'s finances and existing life insurance and annuity contracts. Tepedino falsely certified that he "determined that all questions are answered fully, completely, and accurately as supplied by the applicant." J.S. also alleged he did not sign the forms and Tepedino forged his signature. The annuity application documents were faxed on MTS letterhead.

A-2797-19

Tepedino provided additional false information about J.S. to Midland in a recorded phone conversation and in faxed documents. Midland paid Tepedino $63,490.02 in commissions for the annuity policies sold to J.S.

J.S. reported the falsehoods to Midland. Midland would have declined to issue annuity contracts to J.S. had accurate information been supplied regarding his age and financial condition. Indeed, J.S.'s age exceeded the maximum age for the sale of this type of annuity in New Jersey.

On December 20, 2012, J.S. filed a complaint with the Department regarding Tepedino's conduct during the sale of the Midland annuities. In his complaint, J.S. stated that Tepedino sold him unsuitable annuities, provided incorrect account information, and attempted to sell him a reverse mortgage. In response to the complaint, the Department issued an Order to Show Cause (OTSC) against Tepedino and MTS (collectively respondents). MTS claimed it was unaware of Tepedino's dealings with J.S. and did not share in the commissions.

The contractual relationship between Tepedino and Midland was terminated on January 25, 2013. Midland did not recoup the commissions from Tepedino. J.S. was credited all monies back by Midland.

A-2797-19

In an amended OTSC, the Department alleged respondents violated: the New Jersey Insurance Producer Licensing Act of 2001 (Producer Act), N.J.S.A. 17:22A-26 to -48[1]; the Insurance Producer Licensing regulations, N.J.A.C. 11:17-1.1 to -7.7; the Insurance Producer Standards of Conduct, N.J.A.C. 11:17A-1.1 to -4.12; the New Jersey Insurance Fraud Prevention Act (Fraud Act), N.J.S.A. 17:33A-1 to -30; and the New Jersey Trade Practices Act, N.J.S.A. 17B:30-1 to-63. The Department sought civil penalties and revocation of Tepedino's producer's license.

Respondents filed answers denying the Department's allegations and the matter was transmitted to the Office of Administrative Law (OAL) as a contested case. The matter was assigned to an Administrative Law Judge (ALJ) for hearing.

The parties proceeded with cross-motions for summary decision. The Department sought summary decision on all counts of the OTSC, contending there were no genuine issues of material fact. MTS opposed the Department's motion and cross-moved for summary decision. Tepedino also opposed the Department's motion and requested dismissal of the charges brought against

---

[1] The Department alleged respondents violated N.J.S.A. 17:22A-40(a)(2), (5), (7), (8), (10), and (16).

him, contending the charges were time-barred. He also alleged J.S. was not innocent, had financial problems, and wanted a "get rich quick" scheme.[2]

MTS argued it only had an employment contract with Tepedino to sell property and casualty insurance products and Tepedino's sales of Midland products were outside the scope of the employment agreement. MTS also claimed that Tepedino's conduct with J.S. was not insurance-related because it was not related to the insurance products sold by MTS.

Following supplemental briefing, the ALJ heard oral argument on April 12, 2019, which included telephonic sworn testimony by Tepedino. At the ALJ's request, the Department provided an allocation of the penalties sought from respondents under the various counts contained in the OTSC.

The ALJ issued a thirty-seven-page May 23, 2019 order that: (1) denied summary decision to respondents on all counts; (2) granted partial summary decision to the Department on counts one, two, three, five, and six of the OTSC; (3) granted summary decision to the Department on count eight of the OTSC for violations of N.J.S.A. 17:33A-4(a)(4)(b), except those related to the alleged

_____

[2] In her order granting partial summary decision, the ALJ questioned the veracity of Tepedino's counterstatement of facts, stating it was "impossible to reconcile Tepedino's statements that in 2012, he knew that J.S. was in dire financial straits and also believed that J.S. had assets of close to $12 million and monthly income of more than $100,000."

forgery of J.S.'s signature; (4) denied summary judgment to the Department on counts four, seven, and the aforestated portion of count eight related to the alleged forgery of J.S.'s signature; (5) ordered respondents to pay $26,000 in fines and statutory surcharge and $27,400 in attorney's fees and costs of investigation to the Department; and (6) ordered the matter proceed to hearing on the remaining charges.

The ALJ was not persuaded by MTS's argument that annuity products sold by Tepedino were outside the scope of MTS's business. The ALJ reasoned that because Midland had a contract with MTS previously, MTS did sell annuity products at one point and the business was not exclusively focused on selling property and casualty products. The ALJ determined that MTS was vicariously liable for Tepedino's conduct, its employee.

On June 28, 2019, the Department formally withdrew counts four and seven and the charge of forgery of J.S.'s signature under count eight. On July 1, 2019, the ALJ closed the record and issued an Initial Decision reflecting her partial summary decision order. The ALJ concluded that neither Tepedino nor MTS "gave an adequate explanation of the change in contractual relationships from between Midland and [MTS] to between Midland and Tepedino."

MTS filed exceptions to the Initial Decision that asserted: (a) granting summary decision to the Department was error because there were genuine issues of material fact regarding whether Tepedino's actions were undertaken within the scope of his employment by MTS; (b) the civil penalties imposed against MTS were excessive; and (c) there was no legal basis for the award of attorney's fees and costs of investigation against MTS.

On January 27, 2020, the Commissioner issued a fifty-two-page final decision and order that incorporated and adopted the findings of fact and conclusions set forth in the Initial Decision, except as expressly modified. More specifically, the Commissioner adopted the ALJ's conclusion that MTS was vicariously liable for the conduct of Tepedino, its employee. She also adopted the ALJ's conclusion that as to count one, respondents violated N.J.S.A. 17:22A-40(a)(2), (5), and (7), N.J.A.C. 11:17A-2.8, and N.J.S.A. 17B:30-6. As to count two and paragraph one of count eight, respondents violated N.J.S.A. 17:22A-40(a)(2), (5) (7), (8), and (16), N.J.A.C. 11:4-2.8(a)(3), and N.J.S.A. 17:33a-4(A)(4)(B). The Commissioner also found respondents violated N.J.S.A. 17B:30-6. As to count three and the related violation alleged in paragraph two of count eight, the Commissioner adopted the ALJ's conclusion that respondents violated N.J.S.A. 17:22A-40(a)(2), (5) (7), (8), and (16), and N.J.S.A. 17:33a-

4(A)(4)(B), and N.J.A.C. 11:4-2.8(a)(3). As to count five and the related violation alleged in count eight, the Commissioner adopted the ALJ's conclusion that respondents violated N.J.S.A. 17:22A-40(a)(2), (5) (7), (8), and (16), N.J.S.A. 17:33a-4(A)(4)(B), N.J.A.C. 11:4-2.8(a)(3), and N.J.A.C. 11:4-2.8(a)(3). As to count six, and the related violation alleged in count eight, the Commissioner adopted the ALJ's conclusion that respondents violated N.J.S.A. 17:22A-40(a)(2), (5) (7), (8), and (16), N.J.A.C. 11:4-2.8(a)(3), and N.J.A.C. 11:4-2.8(a)(3).

With respect to imposing joint and several liability for the civil monetary penalties, the Commissioner explained:

> [I]t is undisputed that Tepedino was employed by MTS prior to and at the time of the sale of Midland annuity products to [J.S.], to sell insurance products. In addition, it is undisputed that Midland and MTS had a contract in place from January 6, 2009 to May 30, 2011 relating to the sale of annuity products, during which time Tepedino was the only MTS employee to sell said products. Also undisputed is that on May 31, 2011, Midland and Tepedino signed a contract to do business, while Tepedino was employed at MTS. The ALJ found that no evidence was presented to indicate any change of contractual relationship between MTS and Tepedino upon the commencement of Tepedino's contract with Midland. In fact, the record substantiates Tepedino's continued employment with MTS while conducting business with Midland, as the documentary evidence submitted shows that after May 31, 2011, when Tepedino and Midland entered into a contract,

> Tepedino used (1) MTS's bank account as a pass through for Midland client funds; (2) MTS's fax machines and MTS's cover pages to transmit documentations to Midland for [J.S.'s] [a]nnuity [a]pplications . . . ; (3) the MTS office address to correspond with Midland regarding [J.S.'s] [a]nnuity [a]pplications . . .; and (4) MTS letterhead to communicate with Midland regarding [J.S.'s] [a]nnuity [a]pplications . . . .
>
> [(Citations omitted).]

The Commissioner further highlighted that the activity was surely "insurance-related" because MTS sold Midland products when the two companies "had a contract in place" for at least the previous five years. "Therefore, MTS did, in fact, sell annuity contracts, and its business was not limited to only property and casualty products."

The Commissioner ultimately concluded that MTS was vicariously liable for the acts of Tepedino, its employee, citing N.J.A.C. 11:17-2.10(a)(4) ("filing a notice of agency contract shall be deemed to mean that the producer is that company's agent for all kinds or lines of insurance for which the company and producer are jointly authorized") and N.J.A.C. 11:17A-1.6(c) ("Licensed partners, officers and directors, and all owners with an ownership interest of [ten] percent or more in the organization shall be held responsible for all insurance related conduct of the organization licensee, . . . and its employees.").

The Commissioner applied the principle that an employer is vicariously liable for the actions of their employee if the employee was acting within the scope of their employment. The Commissioner found "[t]he evidence presented clearly demonstrate[d] that Tepedino was holding himself out as an employee of MTS when he conducted business with Midland on behalf of [J.S.]."

The Commissioner next addressed the civil penalties and attorney's fee award recommended by the ALJ. As part of her analysis in setting the civil monetary penalties, the Commissioner considered the Kimmelman[3] factors.

As to factor one, good or bad faith, the Commissioner agreed with the ALJ that Tepedino's bad faith was clear based on his choice of an elderly victim and the misstatement of material facts to induce the sale of the annuities. The Commissioner also agreed that MTS's negligence was bad faith because their "employee was conducting insurance-related business from [their] office, using [their] resources, including [their] bank account, to conduct fraudulent activity." Thus, factor one weighed in favor of a monetary penalty against MTS.

---

[3] Kimmelman v. Henkels & McCoy, Inc., 108 N.J. 123 (1987). The Court enumerated seven factors to be considered in setting civil penalties: (1) good or bad faith of the violator; (2) ability to pay; (3) amount of profits from the illegal activity; (4) injury to the public; (5) duration of the conduct; (6) existence of criminal or treble damages actions; and (7) past violations. Id. at 137-39.

A-2797-19

As to factor two, ability to pay, the Commissioner again agreed with the ALJ that both Tepedino and MTS should be assessed monetary penalties, finding neither had provided any information showing an inability to pay penalties. The Commissioner concluded that neither Tepedino nor MTS satisfied their burden of proving an inability to pay civil penalties. This factor weighed in favor of imposing a monetary penalty against MTS.

As to factor three, amount of profits realized from the unlawful activity, the Commissioner concurred with the ALJ that this factor weighs in favor of a monetary penalty against Tepedino "because his fraudulent actions generated $63,490.02 in commissions, none of which was returned to Midland."

As to factor four, the injury to the public, the ALJ and the Commissioner found that Tepedino injured the public based on Midland's expenditures to make the victim whole after the fraud occurred. Regarding MTS, the ALJ found that deterrence only occurred if the agency is penalized for the actions of its employees. The Commissioner emphasized the importance of public trust in insurance providers and the need to punish MTS for its failure to supervise its employee.

As to factor five, the duration of the fraudulent conduct, the fraudulent activities took place between September and December 2012. The ALJ noted

12

that Tepedino admitted that his misconduct would never have been discovered but for J.S.'s complaint to the Department. The Commissioner was unpersuaded by MTS's argument that it had no knowledge of the fraud until J.S. filed his complaint, noting that the short duration of the fraudulent scheme resulted from J.S.'s diligence, not because of any militating actions taken by MTS. This too weighed in favor of penalizing both respondents.

As to factor six, neither Tepedino nor MTS had been criminally charged or assessed other penalties related to this matter. This weighed in favor of a monetary penalty since neither had yet "paid a price" for the unlawful conduct.

As to factor seven, respondents had no prior violations. This factor weighed against imposing a significant monetary penalty.

Upon balancing the aggravating and mitigating factors, the Commissioner concluded that monetary penalties should be assessed against respondents in amounts "substantially higher . . . than those recommended by the ALJ." The Commissioner explained that Tepedino took advantage of J.S.'s "trust and sold him an inappropriate annuity product that was not suited to his needs" and "repeatedly submitted . . . documents . . . containing false and misleading information in order to collect a commission on the sale that Tepedino was not

forced to return." Tepedino's fraudulent conduct occurred while in MTS's employ, rendering MTS vicariously liable for the penalties.

The Commissioner imposed separate joint and several civil penalties under the Producer Act and the Fraud Act because the Acts "serve different remedial purposes and insurance producers who commit insurance fraud will face civil penalties under both [Acts]." The penalties totaled $45,000.[4] The Commissioner noted the penalties are "far less than the maximum that could be imposed" and were consistent with prior decisions.

The Commissioner revoked Tepedino's producer's license. This appeal followed.

MTS raises the following points for our consideration:

> A. THERE IS A GENUINE ISSUE OF MATERIAL FACT REGARDING TEPEDINO'S STATUS AS AN EMPLOYEE WITH THE AGENCY AND THE COMMISSIONER ERRED AS A MATTER OF LAW FINDING VICARIOUS LIABILITY IN A SUMMARY DECISION.
>
> B. THE COMMISSIONER WAS WITHOUT SUBSTANTIAL BASIS TO AWARD JOINT AND

---

[4] The Commissioner added a $5,000 penalty for count one, a violation of the Producer Act, two $5,000 penalties for count two and the first paragraph of count eight, violations of the Fraud Act and Producer Acts, two $5,000 penalties for count three (Producer Act) and paragraph two of count eight (Fraud Act), two $5,000 penalties for count five and paragraph four of count eight, and two $5,000 penalties for count six and paragraph five of count eight.

14

SEVERAL LIABILITY FOR CIVIL PENALTIES AND MODIFY THE AMOUNT TO $45,000.

C. THE ATTORNEY'S FEES AWARD IN THIS MATTER ARE INCONSISTENT WITH R.P.C. 1.5 AND THE STANDARD OF REASONABLENESS.

We find no merit in these arguments and affirm substantially for the reasons expressed by Commissioner Marlene Caride in her comprehensive and well-reasoned written decision. We add the following comments.

A.

Our scope of review of an administrative agency's final decision is limited. In re Herrmann, 192 N.J. 19, 27 (2007). "[A]n appellate court reviews agency decisions under an arbitrary and capricious standard." Zimmerman v. Sussex Cnty. Educ. Servs. Comm'n, 237 N.J. 465, 475 (2019). "An administrative agency's final quasi-judicial decision will be sustained unless there is a clear showing that it is arbitrary, capricious, or unreasonable, or that it lacks fair support in the record." Herrmann, 192 N.J. at 27-28. The party challenging the administrative action bears the burden of making that showing. Lavezzi v. State, 219 N.J. 163, 171 (2014) (citing In re J.S., 431 N.J. Super. 321, 329 (App. Div. 2013)).

When reviewing an agency's final determination, we examine:

(1) whether the agency's action violates express or implied legislative policies, that is, did the agency follow the law;

(2) whether the record contains substantial evidence to support the findings on which the agency based its action; and

(3) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.

[Allstars Auto Grp., Inc. v. N.J. Motor Vehicle Comm'n, 234 N.J. 150, 157 (2018) (quoting In re Stallworth, 208 N.J. 182, 194 (2011)).]

Where an agency's decision satisfies these criteria, we accord substantial deference to the agency's fact-finding and legal conclusions, recognizing "the agency's 'expertise and superior knowledge of a particular field.'" Circus Liquors, Inc. v. Governing Body of Middletown Twp., 199 N.J. 1, 10 (2009) (quoting Greenwood v. State Police Training Ctr., 127 N.J. 500, 513 (1992)). See also In re Request to Modify Prison Sentences, 242 N.J. 357, 390 (2020) ("Wide discretion is afforded to administrative decisions because of an agency's specialized knowledge").

That said, an appellate court is "in no way bound by the agency's interpretation of a statute or its determination of a strictly legal issue." Mayflower Sec. Co. v. Bureau of Sec., 64 N.J. 85, 93 (1973). However, "[a]n

16

administrative agency's interpretation of a statute it is charged with enforcing is entitled to great weight." In re Saddle River, 71 N.J. 14, 24 (1976) (citation omitted). Moreover, we give great deference to an agency's "interpretation and implementation of its rules enforcing the statutes for which it is responsible." In re Freshwater Wetlands Prot. Act Rules, 180 N.J. 478, 489 (2004). "Deference controls even if the court would have reached a different result in the first instance." Herrmann, 192 N.J. at 28.

Here, the ALJ granted a partial summary decision to the Department and denied the cross-motions for summary decision. The summary decision became final when the Department withdrew its remaining claims. The standard for summary decision motions is similar to summary judgment motions in Superior Court. Summary decision "may be rendered if the papers and discovery which have been filed, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to prevail as a matter of law." N.J.A.C. 1:1-12.5(b).

B.

MTS argues the Commissioner lacked a substantial basis to impose joint and several liability for the civil penalties. MTS contends the Kimmelman

analysis was flawed because it was not bifurcated between respondents. We disagree.

Administrative agencies have "broad discretion in determining the sanctions to be imposed for a violation of the legislation [they] are charged with administering." In re Scioscia, 216 N.J. Super. 644, 660 (App. Div. 1987). "When resolution of a legal question turns on factual issues within the special province of an administrative agency, those mixed questions of law and fact are to be resolved based on the agency's fact finding." Campbell v. N.J. Racing Comm'n, 169 N.J. 579, 588 (2001) (citing Boss v. Rockland Elec. Co., 95 N.J. 33, 42 (1983)). "The Commissioner's expertise in the field of insurance must be given great weight." In re Aetna Cas. & Sur. Co., 248 N.J. Super. 367, 376 (App. Div. 1991) (citing IFA Ins. Co. v. N.J. Dep't of Ins., 195 N.J. Super. 200, 206-07 (App. Div. 1984)).

Here, MTS does not contest that insurance statutes and regulations were violated and that Tepedino engaged in fraud. Instead, MTS claims it should not be liable for the insurance-related fraud committed by its employee, Tepedino, the son of MTS's proprietor. Vicarious liability for the insurance-related act of an employee is well established. Tepedino was employed by MTS both prior to and at the time of the fraud sale of annuities to J.S. Tepedino had an office at

MTS, and routinely used its fax machine, telephone, letterhead, mailing address, receptionists, and bank account to conduct business.

While Tepedino eventually contracted directly with Midland, he presented no convincing evidence indicating any change in the contractual relationship between MTS and Tepedino when that occurred. On the contrary, Tepedino's employment by MTS continued and he still used MTS's bank account for Midland client funds, its fax machine, office address, and letterhead to correspond with and convey documents to Midland regarding J.S.

"An employer shall be responsible for the insurance-related conduct of an employee." N.J.A.C. 11:17-2.10(b)(4). In turn, "all owners with an ownership interest of [ten] percent or more in the organization shall be held responsible for the insurance related conduct of the organization[']s . . . employees." N.J.A.C. 11:17A-1.6(c). The Commissioner correctly noted that an employer is vicariously liable for the tortious actions of its employee when acting within the scope of his or her employment. Carter v. Reynolds, 175 N.J. 402, 408-09 (2003) (citing Lehmann v. Toys 'R' Us, Inc., 132 N.J. 587, 619 (1993)); see also Restatement (Second) of Agency § 219 (Am. Law Inst. 1958). The record supported that Tepedino was holding himself out as an employee of MTS when he conducted business on behalf of J.S. with Midland.

The Commissioner also found that MTS, "[a]n employing producer cannot avoid responsibility by turning a blind eye to the fraudulent conduct of an employee taking place in their offices and through the use of the employing producer's resources." The record supports the Commissioner's determination that MTS is vicariously liable for Tepedino's conduct under these circumstances, thereby justifying joint and several liability for the civil penalties imposed, in order to deter future misconduct by MTS and the industry as a whole.

C.

MTS next argues that the civil penalties imposed are excessive. We disagree. We accord deference to the review of disciplinary sanctions imposed by an agency. Herrmann, 192 N.J. at 28. Therefore, "appellate review of an agency's choice of sanction is limited." In re License Issued to Zahl, 186 N.J. 341, 353 (2006). A reviewing court "will modify a sanction 'only when necessary to bring the agency's action into conformity with its delegated authority.'" Id. at 353-54 (quoting In re Polk License Revocation, 90 N.J. 550, 578 (1982)). We therefore review administrative sanctions to determine whether the sanction "is so disproportionate to the offense, in light of the circumstances, as to be shocking to one's sense of fairness." Herrmann, 192 N.J. at 28-29.

20

Insurance producers "act in a fiduciary capacity and [are] held to a high standard of conduct." In re Comm'r of Banking & Ins., 98 N.J. Super. 263, 268 (App. Div. 1967). Civil monetary penalties "deter future unlawful behavior by the [violator] and those similarly situated." Kimmelman, 108 N.J. at 129. The Commissioner considered and weighed the Kimmelman factors and determined that respondents should incur a monetary penalty for each statutory violation.

N.J.S.A. 17:22A-45(c) authorizes the Commissioner to levy penalties, not to exceed $5,000 for the first offense and not to exceed $10,000 for each subsequent offense. The Fraud Act authorizes the Commissioner to impose a $5,000 civil penalty on the first offense, $10,000 on the second offense, and penalties not to exceed $15,000 for each subsequent offense in addition to restitution. N.J.S.A. 17:33A-5(c). A statutory surcharge of $1,000 is also permitted. N.J.S.A. 17:33A-5.1.

The Commissioner increased the civil penalties from $26,000 to $45,000 based on her decision to impose fines under both the Producer Act and the Fraud Act because they serve different purposes. The Commissioner was within her statutory authority to do so and provided a litany of OAL decisions to support her choice to impose harsher penalties and further deter insurance fraud of this kind.

21

We discern no abuse of discretion. The civil penalties were within statutory limits. Midland refunded the purchase price of the annuities to J.S., not Tepedino or MTS. In turn, Midland paid Tepedino $63,490.02 in unrecovered commissions for the annuity policies sold to J.S. Considering the amounts involved, the civil penalties do not shock our sense of fairness. On the contrary, they were not excessive or otherwise arbitrary, capricious, or unreasonable.

D.

Finally, MTS contends that the attorney's fees awarded are inconsistent with RPC 1.5 and are unreasonable. MTS argues the ALJ granted petitioner's request for attorneys' fees in a "summary fashion without any discussion or findings as to the 'reasonableness' of the fee." Defendant suggests a hearing should have been conducted to evaluate the reasonableness of $27,400 fee award and submits the Commissioner utilized the time extensions to "craft a defense" to the fee decision which violated the reasonableness standard. Specifically, defendant complains the investigator's time is not broken down in one-tenth of an hour increments, one entry out of hundreds does not have a description, and attorney time descriptions lack detail. We are unpersuaded.

22

When authorized by statute, courts are authorized to award reasonable attorneys' fees to the prevailing party. R. 4:42-9(a)(8). The Commissioner may also order reimbursement of the costs of investigation and prosecution for violations of the Producer Act. Pursuant to N.J.S.A. § 17:22A-45(c) "the commissioner or the court, as the case may be, may order restitution of moneys owed any person and reimbursement of the costs of investigation and prosecution, as appropriate." The Fraud Act also permits the Commissioner to order reimbursement costs and attorneys' fees. N.J.S.A. 17:33A-5(c).

The first step in calculating a fee award under a fee-shifting statute is to determine the "lodestar," which is arrived at by multiplying the number of hours reasonably expended by a reasonable hourly rate. Rendine v. Pantzer, 141 N.J. 292, 334-35 (1995). The statute does not require the time expended by attorneys or investigators to be broken down into fractions of an hour.

Here, the Commissioner found the hours expended and the hourly rates reasonable. After determining each attorney's years of experience, she used the Department of Labor Fee Schedule to calculate the hourly rate. The Department submitted voluminous logs reflecting the time expended. The Commissioner approved the requested 84.8 hours, which was less than actual hours expended by Department attorneys.

MTS objects to a single entry that does not include a description of the service performed. This minor omission does not warrant denying imposition of reasonable costs of investigation.

We conclude that the Commissioner properly reviewed the attorneys' fees and costs of investigation and awarded reasonable fees and costs. We discern no abuse of discretion.

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-2797-19