**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3654-21

NEW JERSEY REAL
ESTATE COMMISSION,

      Petitioner-Respondent,

v.

RICHARD A. KARPF,

      Respondent-Appellant,

and

JOSEPH THOMAS,

      Respondent.

_____

Argued February 5, 2024 - Decided April 1, 2024

Before Judges Sabatino, Mawla, and Marczyk.

On appeal from the New Jersey Real Estate Commission, Department of Banking and Insurance, Docket No. CAM-16-018.

Mario A. Iavicoli argued the cause for appellant.

Nicholas Klingbeil Kant, Deputy Attorney General, argued the cause for respondent (Matthew J. Platkin, Attorney General, attorney; Sookie Bae-Park, Assistant Attorney General, of counsel; William B. Puskas, Jr., Deputy Attorney General, on the brief).

PER CURIAM

Respondent Richard A. Karpf[1] appeals from the New Jersey Real Estate Commission's ("Commission") June 14, 2022 final determination and order suspending his broker's license for three years and imposing a $5,000 fine. Based on our review of the record and applicable legal principles, we affirm in part, vacate in part, and remand for further proceedings consistent with this opinion.

I.

Karpf has been a licensed real estate broker since 1979 and owns a real estate business in Cherry Hill. In 2014, the Commission received an anonymous letter alleging Karpf failed to keep his real estate office open to the public during normal business hours and that he worked full-time as a teacher in violation of the Commission's regulations. This prompted an investigation.

---

[1] We refer to Richard as "Karpf" and other witnesses who share his last name by their first name. We intend no disrespect.

In October 2016, following the investigation, the Commission filed an order to show cause ("OTSC"). The Commission sought to revoke or suspend Karpf's real estate license and impose civil penalties and costs for Karpf's alleged violations under: (1) N.J.A.C. 11:5-4.4(a) for failing to maintain and supervise his licensed real estate office on a full-time basis and failing to have his real estate office open to the public during usual business hours, and (2) N.J.S.A. 45:15-17(e) alleging his conduct demonstrated unworthiness, incompetency, bad faith, or dishonesty.[2] In January 2020, the matter was transferred to the Office of Administrative Law ("OAL") for a hearing before an Administrative Law Judge ("ALJ"). The ALJ conducted a two-day hearing in September 2021, and heard testimony from several witnesses.

Dana Tatarek, an investigator for the Commission, conducted an investigation between June and the fall of 2014. She testified she conducted surveillance of Karpf's business by periodically going to his office at different

---

[2] The OTSC also alleged certain statutory and regulatory violations stemming from an alleged failure by Karpf and one of his real estate agents, Joseph Thomas, to timely deposit certain checks. On February 1, 2018, Thomas entered into a consent order resolving all of the violations pending against him. On September 26, 2017, a hearing commenced before the Commission at which time Count I and Count II were dismissed as to Karpf. Accordingly, Count III of the OTSC alleging Karpf's conduct violated N.J.A.C. 11:5-4.4(a) and N.J.S.A. 45:15-17(e) remained as the sole count to be adjudicated.

A-3654-21

times of the day, usually between the hours of 8:00 a.m. and 4:00 p.m.  Tatarek visited the property approximately ten to twelve times and each time it was not open to the public.  She did, however, on one occasion see Karpf cutting up signs on the property, but she did not speak with him because she was just "observing."  Tatarek noticed a video doorbell camera had been installed at Karpf's office towards the end of her investigation, sometime in the fall of 2014.  During that visit, Tatarek rang the doorbell and spoke to Karpf through the video doorbell, but he did not let her in and informed her an appointment was required.  She did not know where Karpf was physically located when she spoke with him that day.  In addition to surveilling Karpf's property, Tatarek also contacted the Philadelphia School District and obtained records documenting that Karpf was employed "full-time" as a teacher.

Tatarek eventually met with Karpf, and he provided her a statement regarding his operation of the office.  He noted his office was open seven days a week, and he "installed call forwarding and email" to conduct business with agents and customers.  He also set up a "surveillance system to view customers and unwanted solicitations."  He stated he considered his teaching in the Philadelphia School District to be a "part[-]time job[,] 180 days per year."

4

On cross-examination, Tatarek was asked if she ever made an appointment to see Karpf. She explained that as an investigator, she did not need an appointment because such action was permissible under the Commission rules. Tatarek testified she did not call the number provided on the sign on the office door to make an appointment prior to her visits.[3]

Lauren Glantzberg, a supervisor of investigations for the Commission, testified Karpf was the only broker of record for his real estate office. She was familiar with Tatarek's investigation of Karpf, and she provided Tatarek direction during her investigation. Glantzberg testified one of her directives to Tatarek was to stop at Karpf's office at various times in the day to get an accurate representation of the activity within the office.[4]

---

[3] Karpf asserts that Tatarek's testimony was false because she testified she kept notes of her visits to Karpf's office, but the notes were never located by the Commission. Moreover, the Commission did locate "[New Jersey Department of Banking and Insurance ("DOBI")] - Trip Record Sheets" which only indicated Tatarek traveled to Cherry Hill four times during the period she was conducting the investigation.

[4] Glantzberg testified investigators typically incorporate their investigative findings into their report, which is then sent to her. If notes were prepared by Tatarek as it related to her investigation, Glantzberg had no idea what happened to them, because she had never seen them.

A-3654-21

On cross-examination, Glantzberg was questioned if real estate offices were impacted because of the pandemic—more specifically, if offices had to close their doors to the public. In response, she stated the Commission rules did not change during the pandemic, but the Governor issued Executive Orders which mandated the closure of certain businesses. Glantzberg agreed the real estate industry was able to function during the pandemic. Without having access to her files, she could not say with any certainty whether any complaints had been filed with her office during the COVID-19 pandemic because a real estate office was not open to the public.[5]

Glantzberg was aware of investigative practices where field investigators show up at a broker's office unannounced. She agreed that a property owner has the right to determine who may enter their property but, under the rules and regulations, a real estate office is required to be open to the public during business hours. She did not know whether Karpf could be reached by phone during the business day. She was aware that Tatarek did, at one point, call the number on the door and speak to Karpf. However, she did not believe there was anyone in the office. She testified the regulations require the broker of record

---

[5] The time period of the investigation at issue was in 2016, prior to the 2020 COVID-19 pandemic.

A-3654-21

to maintain a full-time main office. She acknowledged that today's real estate market has changed, in that most property listings are online.

Karpf testified the difference between a broker's license and a salesperson's license is that a salesperson is required to work under a broker, and a broker can work independently. He asserted he was available every day of the week around the clock, "[t]wenty-four hours, basically." He stated he was a teacher in the Philadelphia school system and worked five days a week the entire school year starting in September and ending in June.[6] He taught five classes a day with each class lasting from forty-five minutes to an hour or more, and he was at school from 8:00 a.m. to 3:00 p.m. He considered his job as a school teacher part-time, and his job as a real estate broker full-time. When classes ended, he would go straight to his office and work until 10:00 p.m. He would also work in the office on weekends.

Karpf stated that the real estate industry has evolved over the years from when he first started because potential clients used to come into the office and

---

[6] Karpf testified he worked in the Philadelphia school system as a teacher "[i]n and out over a period of many years," "probably for over [thirty] years, possibly." He testified he retired in or around 2016. The records from the Philadelphia school system indicated he worked there since at least 2001.

go through the books. However, he testified everything is now done through the internet.

Deborah Ann Harris-Karpf, Karpf's wife, testified that for the past twenty years, until 2019, she worked full-time for a television station in Philadelphia. Her work hours at the time were 4:00 a.m. to 1:00 p.m. She testified she has been a licensed salesperson with Karpf's office since 2005. Deborah would leave work at the television station at 1:00 p.m. and get to the real estate office by 1:30 p.m.[7] If someone called looking for Karpf, she would take a message and relay it to him. She has never had to contact Karpf on an emergent basis. Deborah testified her husband would arrive at the office around 3:30 p.m., and they would both work weekends. She noted the real estate agents that worked for the company "[v]ery rarely" came to the office. She stated that Karpf was always able to supervise her and any of the other agents connected to the office.

Arthur Karpf, Karpf's father, testified he had worked at Karpf's office for several years, mostly on weekdays from 9:00 a.m. to 5:00 p.m. He was always

---

[7] On cross-examination, Deborah confirmed that she would typically arrive at the real estate office around 1:30 p.m. When shown her deposition testimony in a separate matter, specifically wherein she stated she would arrive at the real estate office around 3:00 or 4:00 p.m., Deborah stated that her arrival at the real estate office varied depending on the day.

A-3654-21

able to reach Karpf to convey messages. While Arthur holds a real estate license, he did not actively use it.

Three of Karpf's part-time agents—William Toner, William Hamish, and Michael DeLaura—each testified Karpf was always accessible and responsive even when out of the office. DeLaura also testified the industry has changed over the years, and currently there is not as much of a need for office time because most of his work is handled by using Google.

Jared Karpf, Karpf's son, echoed the testimony of the other agents, stating he never had difficulty reaching his father, nor did any of his clients. He also testified the internet has completely changed the relationship between brokers and clients.

Based upon the testimonial and documentary evidence presented in the matter, the ALJ concluded Karpf's conduct, which had spanned for many years, was in violation of N.J.A.C. 11:5-4.4(a), and demonstrated unworthiness, incompetence, and bad faith in violation of N.J.S.A. 45:15-17(e). The ALJ concluded Karpf's office was not, based on the language of N.J.A.C. 11:5-4.4, "open to the public during usual business hours." She further found that "business hours" are defined as "[t]hose hours of the day during which, in a given community, commercial, banking, professional, public, or other kinds of

business are ordinarily carried on," which "is . . . not the time during which a principal requires an employee's services, but the business hours of the community generally." Bus. Hours Definition & Legal Meaning, L. Dictionary, https://thelawdictionary.org/business-hours/ (last visited Mar. 15, 2024).

The ALJ found that the office door was locked, and when the investigator went to visit on multiple occasions, no one answered. Specifically, the ALJ observed,

> [a]t no time during any of [Tatarek's] unannounced visits did anyone answer the door and/or let her in the office despite the fact that [Arthur] testified that he was there all day during most weekdays, and [Deborah] stated that she was in the office at some point every afternoon during the week and worked on the weekends.

The ALJ found Tatarek's testimony "to be very credible," as a result of her "surveillance over several months and obtaining documentation." Regarding the trip history documents from September and October 2016, the ALJ noted they included some of the days and times when school was in session and Karpf "would have been at his full-time position of teaching."

However, the ALJ "found [Karpf's] testimony that he operated his real estate business on a full-time basis during usual business hours to be equally self-serving and disingenuous given the testimonial and documentary evidence

10

presented in this matter." The ALJ also stated that Karpf's full-time teaching job "violate[d] N.J.A.C. 11:5-4.4 in that absent work-related absences, he was required to be physically present in the office during usual business hours. Clearly, teaching is not related to [Karpf's] real estate business." The ALJ found Karpf's assertion that he always maintained an office, open to the public, during usual business hours was contrary to the credible evidence presented in this matter. The ALJ determined his full-time employment as a teacher undermined his assertion that he was a full-time broker, and that Karpf could "not be in two places at once nor could his sales staff or clients reach him when he was teaching."

With respect to N.J.S.A. 45:15-17(e), the ALJ concluded that Karpf's conduct, which took place over many years when he worked as a full-time teacher, was in violation of N.J.A.C. 11:5-4.4(a), which evidenced unworthiness, incompetence, and bad faith in violation of N.J.S.A. 45:15-17(e). Karpf's "continued intentional misrepresentation of his obligations under the Act to justify his actions" were a part of the equation in finding a violation of the statute.

The ALJ also evaluated the Kimmelman[8] factors for determining the appropriate monetary penalty. After balancing the factors, the ALJ imposed a $2,500 fine. Additionally, she concluded Karpf's conduct warranted a two-year suspension.

The Commission ultimately adopted the ALJ's findings related to the violations of N.J.A.C. 11:5-4.4(a) and N.J.S.A. 45:15-17(e). The Commission noted N.J.A.C. 11:5-4.4(a) was substantially updated in 1988,[9] to "eliminate any misunderstanding by employing brokers and brokers of record as to their responsibility concerning office management during normal business hours." Additionally, as discussed below, the Commission addressed a similar situation in 1989 where a commenter was concerned the amended regulations would preclude a broker, who also taught real estate prelicensure courses, from teaching courses during normal business hours.[10]

The Commission modified the ALJ's recommendations and increased the monetary penalty from $2,500 to $5,000. It also increased the license suspension to three years.

---

[8] Kimmelman v. Henkels & McCoy, Inc., 108 N.J. 123, 137-39 (1987).

[9] 20 N.J.R. 1160(a) (June 6, 1988).

[10] 21 N.J.R. 2523(a) (Aug. 21, 1989).

II.

On appeal, Karpf contends the case should be dismissed as res judicata because he claims the Commission previously dismissed the OTSC. Karpf next argues he maintained a designated main office open to the public in full compliance with N.J.S.A. 45:15-12. He further asserts the Commission erred in relying on Tatarek's testimony because she misrepresented how many times she visited Karpf's property during her investigation. He contends his office was open during usual business hours, it was always supervised, he was always accessible for clients and sales agents, and he worked full-time as a broker.

Karpf maintains the regulations, which require a broker to maintain a physical office are antiquated, serve no legitimate government purpose, and that N.J.A.C. 11:56-4.4 is vague and confusing. He further contends he was denied due process regarding the Commission's reliance on N.J.A.C. 11:5-3.8, but regardless the regulation supports his position because he worked full-time as a broker. Karpf argues he should not have been penalized because he did not act in bad faith, he obtained no profit from illegal activity, and there was no injury to the public.

"The scope of review in a case involving [an] appeal from the [Commission] is the same as that for other administrative agencies . . . ."

A-3654-21

Morgan v. Saslaff, 123 N.J. Super. 35, 38 (App. Div. 1973). We have "'a limited role' in the review of [agency] decisions." In re Stallworth, 208 N.J. 182, 194 (2011) (quoting Henry v. Rahway State Prison, 81 N.J. 571, 579 (1980)). "[A] 'strong presumption of reasonableness attaches to [an agency decision].'" In re Carroll, 339 N.J. Super. 429, 437 (App. Div. 2001) (quoting In re Vey, 272 N.J. Super. 199, 205 (App. Div. 1993)). "In order to reverse an agency's judgment, an appellate court must find the agency's decision to be 'arbitrary, capricious, or unreasonable, or . . . not supported by substantial credible evidence in the record as a whole.'" Stallworth, 208 N.J. at 194 (quoting Henry, 81 N.J. at 579-80). Our Supreme Court has held:

> In determining whether agency action is arbitrary, capricious, or unreasonable, a reviewing court must examine:
>
> (1) whether the agency's action violates express or implied legislative policies, that is, did the agency follow the law; (2) whether the record contains substantial evidence to support the findings on which the agency based its action; and (3) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.
>
> [Ibid. (quoting In re Carter, 191 N.J. 474, 482-83 (2007)).]

14

An appellate court "may not substitute its own judgment for the agency's, even though [it] might have reached a different result." Ibid. (quoting Carter, 191 N.J. at 483). "This is particularly true when the issue under review is directed to the agency's special 'expertise and superior knowledge of a particular field.'" Id. at 195 (quoting In re Herrmann, 192 N.J. 19, 28 (2007)). Furthermore, "[i]t is settled that '[a]n administrative agency's interpretation of statutes and regulations within its implementing and enforcing responsibility is ordinarily entitled to our deference.'" E.S v. Div. of Med. Assistance & Health Servs., 412 N.J. Super. 340, 355 (App. Div. 2010) (second alteration in original) (quoting Wnuck v. N.J. Div. of Motor Vehicles, 337 N.J. Super. 52, 56 (App. Div. 2001)). "Nevertheless, '[appellate courts] are not bound by the agency's legal opinions.'" A.B. v. Div. of Med. Assistance & Health Servs., 407 N.J. Super. 330, 340 (App. Div. 2009) (quoting Levine v. State Dep't of Transp., 338 N.J. Super. 28, 32 (App. Div. 2001)). "Statutory and regulatory construction is a purely legal issue subject to de novo review." Ibid.

A.

Karpf argues the cause of action against him should be barred as res judicata. He asserts the OTSC was dismissed because the Commission "did not want the hearing to proceed" and directed the parties to engage in settlement

discussions after it dismissed certain counts of the OTSC.  Karpf contends the Commission later "dismissed the cause of action" because "no settlement occurred," and it "had chosen to dismiss [the matter] . . . since the proceeding was not worthy of the [Commission's] time or effort."

Res judicata serves important goals, including "finality and repose; prevention of needless litigation; avoidance of duplication; reduction of unnecessary burdens of time and expenses; elimination of conflicts, confusion and uncertainty; and basic fairness[.] " First Union Nat'l Bank v. Penn Salem Marina, Inc., 190 N.J. 342, 352 (2007) (alteration in original) (quoting Hackensack v. Winner, 82 N.J. 1, 32-33 (1980)). "Adjudicative determinations by administrative tribunals are entitled to preclusive effect if rendered in proceedings meriting that deference." Olivieri v. Y.M.F. Carpet, Inc., 186 N.J. 511, 522 (2006) (quoting Zoneraich v. Overlook Hosp., 212 N.J. Super. 83, 93-94 (App. Div. 1986)).

Res judicata or claim preclusion applies when a party seeking to apply the doctrine establishes:  (1) a valid judgment on the merits was entered on the claim in a prior action; (2) the parties in the later action are identical or in privity with those in the prior action; and (3) the claim in the later actions arose out of the same transaction or occurrence as the claim in the earlier case.  Watkins v.

16

Resorts Int'l Hotel & Casino, Inc., 124 N.J. 398, 412 (1991). "Claim preclusion applies not only to matters actually determined in an earlier action, but to all relevant matters that could have been so determined." Ibid.

We are unpersuaded by Karpf's argument. On September 26, 2017, the Commission "adjourn[ed] the hearing as to Count [III] . . . to permit counsel the opportunity to discuss settlement." On June 25, 2019, a proposed consent order in settlement of that remaining count was presented and rejected by the Commission. On January 14, 2020, it transferred the matter to the OAL as to remaining claims against Karpf. The transfer order noted that the "only remaining issue to be adjudicated" was "the sole remaining Count of the OTSC, Count [III], [which] alleged that Karpf had failed to maintain and supervise his real estate office full-time."

It is clear there was no final adjudication on the merits of Count III because it was not dismissed. Rather, the matter was merely adjourned for settlement discussions. The Commission subsequently referred the matter for a hearing before an ALJ. It was only after the Commission adopted, in part, the ALJ's decision that this matter was adjudicated. Accordingly, there is no basis to dismiss this matter as res judicata.

B.

17

Karpf next asserts he maintained his Cherry Hill office in compliance with N.J.S.A. 45:15-12.  He argues he worked full-time as a broker, the office was open and supervised seven days a week, and the Commission's OTSC was only filed because Tatarek "misrepresented core . . . facts" regarding her investigation.  He claims Tatarek's testimony was inaccurate that she visited the property ten to twelve times based on the DOBI Trip Records Sheets, which revealed only four trips to Cherry Hill, and her other notes were never produced.  Moreover, the trip records do not specifically reference visits to Karpf's office.  Tatarek also observed Karpf at the office cutting up signs on one of the visits, he answered the video doorbell on another occasion, and met with her on one occasion.

Karpf also argues there was no testimony regarding what "usual business hours" means for the purpose of N.J.A.C. 11:5-4.4(a) and that his usual business hours were from 3:30 to 10:00 p.m. when he was not teaching.  Moreover, he claims the office was open during the week between 9:00 a.m. and 5:00 p.m. when his father was working, and Deborah was in the office weekdays beginning at 1:00 p.m.  The office was also open on weekends.  He also claims he was permitted to have the door locked for security purposes, and the public could

18

"obtain his services by telephone, email, text or in person." Karpf further contends he was always accessible to his agents.

Lastly, Karpf argues he worked as a real estate broker full-time at least fifty hours a week "every week of the year." He claims he did not work thirty-five hours a week as a teacher. That is, although he was at school from 8:00 a.m. to 3:00 p.m., he only "worked" twenty-five hours a week as a teacher. Moreover, "[b]efore, after and between classes" he made calls, corresponded by email and text, reviewed paperwork, and searched the internet. He further claims "it is unimportant as to whether [he] worked part-time or full-time as a teacher" but rather when he worked full-time as a real estate broker.

The Commission is charged with administering the New Jersey Real Estate License Act, N.J.S.A. 45:15-1 to -42. These responsibilities include issuing real estate licenses to individuals and entities under N.J.S.A. 45:15-9, investigating the activities of licensees, and imposing sanctions for violations of the Act under N.J.S.A. 45:15-17. The Commission is also authorized to promulgate rules and regulations for the conduct of the real estate brokerage business. N.J.S.A. 45:15-17(t).

N.J.A.C. 11:5-4.4(a) states:

> Every resident real estate broker not licensed as a broker-salesperson shall maintain a main office for the

transaction of business in the State of New Jersey, which shall be open to the public during usual business hours. This main office and the activities of the licensees working from it shall be under the direct supervision of either the broker . . . or of a person licensed as a broker-salesperson. Such supervision shall be maintained on a full[-]time basis. Maintaining full-time supervision shall not be construed as requiring the person performing the supervisory functions to be present at the office location continuously during usual business hours. However, the person performing the supervisory functions shall provide sufficient information so as to allow the personnel at the main office to make communication with that person at all times. Further, the licensee supervising the main office shall be so employed on a full-time basis and, when not required to be away from the office for reasons related to the business of the office, shall be physically present at that office during usual business hours at least five days per calendar week (excluding vacations and emergencies) and shall not be otherwise employed during such time.

[(Emphasis added).]

During the rulemaking process in 1988, the Commission amended N.J.A.C. 11:5-4.4 (then codified as N.J.A.C. 11:5-1.18) to "ensure that employing brokers and brokers of record are aware of their obligation to directly supervise their primary office location" and to "eliminate any misunderstanding as to their responsibility concerning office management during normal business hours." 20 N.J.R. 1160 (a) (June 6, 1988). The 1988 Commission noted that

20

[consumers] will be assured that the broker's office is properly supervised at all times. The presence of a qualified licensee exerting supervisory authority over all activities at an office on a <u>full-time basis</u> should help to assure that quality service is provided to all members of the public including those who may be dealing directly with a relatively inexperienced licensee.

. . . .

Brokers shall reap the financial rewards from satisfied clients who have received real estate services overseen by a senior licensee. Also, upon implementation of the management procedures as required by the amendment, many real estate enterprises should experience a financial savings because of the reduction of administrative errors and subsequent delays in transactions which frequently result from poorly managed offices. Furthermore, the amendment should reduce the number of complaints from clients to brokers and to the [Commission]. Thus, the Commission will save the time and expense of investigating such complaints and conducting hearings to resolve disputes which frequently arise from a lack of adequate supervision of some licensees.

[<u>Id.</u> at 1161 (emphasis added).]

Then in 1989, the Commission received comments on the amended regulation and was expressly asked to address a similar situation as this case. A commenter "expressed opposition to the amendment because it appeared . . . it would limit a . . . broker of record who also teaches [real estate] prelicensure

21

courses from teaching [those courses] during normal business hours." 21 N.J.R. 2523(a) (Aug. 21, 1989). The Commission responded:

> Such a broker can continue to teach during those hours <u>so long as the broker's main office is supervised by a licensed broker-salesperson during his or her absence</u>. The Commission determined that if such an arrangement cannot be made, <u>such a broker would have to choose whether they wanted to keep their brokerage as their primary occupation</u> and, therefore, relegate their instructional activities to a part-time status, <u>or make education their primary endeavor</u>, in which case they would work as a broker-salesperson for another broker on a part-time basis.
>
> [21 N.J.R. 2523(a) (Aug. 21, 1989) (emphasis added).]

Here, regarding the definition of "usual business hours" and "full-time employment," the ALJ looked to N.J.A.C. 11:5-3.8[11] for guidance, but as the Commission stated, "[o]f note" the ALJ found "usual business hours" were defined as "[t]hose hours of the day during which, in a given community,

---

[11] N.J.A.C. 11:5-3.8 addresses the experience requirement for licensure as a broker. That regulation requires applicants seeking licensure as a broker to show that they have been "continuously licensed and employed on a full-time basis as a real estate salesperson during the three years immediately preceding their application" with "full-time employment" demonstrated by working "as a salesperson under the authority of the broker(s) with whom they were licensed for at least [forty] hours per week and during the hours of approximately 10:00 [a.m.] to 8:00 [p.m.]" <u>Ibid.</u>

commercial, banking, professional, public, or other kinds of business are ordinarily carried on," which "is . . . not the time during which a principal requires an employee's services, but the business hours of the community generally." Bus. Hours Definition & Legal Meaning, L. Dictionary, https://thelawdictionary.org/business-hours/ (last visited Mar. 15, 2024).

Here, the Commission noted Karpf was the broker of record for his office and there was no broker-salesperson working for him. Karpf was "continuously employed full[-]time by the Philadelphia School District as a . . . teacher" from 2001 until 2014. He worked Monday through Friday from 8:00 a.m. to 3:00 p.m., September through June. It further determined while he was teaching in Philadelphia, Karpf was not physically at his real estate office and could not be reached by his staff or clients. Moreover, Tatarek, who the ALJ found to be credible, conducted several unannounced visits at various times of the day, and Karpf's office was closed to the public at those times, despite the testimony that Arthur was there all day on most weekdays and that Deborah was present in the afternoons.

The Commission was unpersuaded by the argument that Karpf maintained a designated office open to the public during "his" usual business hours, and the hours Karpf spent in the office after he was finished teaching did not satisfy

A-3654-21

N.J.A.C. 11:5-4.4. Moreover, it was unconvinced Karpf's office was open during usual business hours on weekdays when he was teaching.

The Commission further referenced the ALJ's decision rejecting Karpf's contention that he was a full-time broker who at all times supervised his real estate office and was accessible to clients and sales representatives. It noted Karpf's own testimony revealed he was a salaried employee at the Philadelphia School District, and as such, he could not have simultaneously complied with his obligation to be employed as a broker on a full-time basis at his real estate office.

The Commission observed the ALJ's findings "were based both on the documentary evidence and the testimony presented at the hearing, including the testimony of Tatarek regarding her surveillance of [Karpf's] office and the uncontroverted evidence that [he] was employed full-time as a teacher by the School District of Philadelphia during normal business hours." The Commission viewed Karpf's teaching responsibilities analogous to the 1989 inquiry made by a broker who also had teaching responsibilities. It noted,

> To be in compliance with N.J.A.C. 11:5-4.4(a), [Karpf] faced the exact choice presented by the [broker in 1989]: he could hire a licensed broker-salesperson to supervise his brokerage office during usual business hours and provide the supervisory safeguards contemplated by N.J.A.C. 11:5-4.4(a) or maintain the

brokerage office as his primary occupation and discontinue teaching.

[See 21 N.J.R. 2523(a) (Aug. 21, 1989).]

The Commission found Karpf "did neither and instead elected to intentionally misrepresent and mischaracterize his teaching position—which required a minimum commitment of [thirty-five] hours per week from 8:00 a.m. to 3:00 p.m. for the duration of the school year, from approximately September to June—as 'part[-]time' employment."

The Commission found Karpf's attempt to minimize his work as a teacher was "self-serving, disingenuous, and contrary to common sense." It further determined he failed to ensure his agents were supervised on a full-time basis. The Commission agreed with the ALJ's conclusion that Karpf was "unavailable during 'usual business hours' as he could not be in two places at once nor could his sales staff or clients reach him when he was teaching." Contrary to Karpf's arguments regarding the credibility of Tatarek, the Commission found the ALJ's findings were fully supported by the evidence and "the uncontroverted fact remains that [Karpf] was employed full[-]time during normal business hours in the Philadelphia school district when he had the responsibility to ensure his broker's office . . . was open to the public and being properly supervised full[-]time, in violation of N.J.A.C. 11:5-4.4(a)." The Commission further concluded

Karpf's violations of N.J.A.C. 11:5-4.4(a), "which continued unabated for years . . . based upon dubious reasoning" demonstrated "unworthiness, incompetence, and bad faith" under N.J.S.A. 45:15-17(e).

We determine the Commission's comprehensive findings were not arbitrary, capricious, or unreasonable, and there was ample evidence in the record to support its conclusions that Karpf violated N.J.A.C. 11:5-4.4(a) and N.J.S.A. 45:15-17(e).  Specifically, there was substantial credible evidence relied upon by the Commission in finding Karpf was not employed as a broker on a full-time basis because he failed to:  maintain and supervise his office on a full-time basis; have the office open during usual business hours; and be physically present during usual business hours five days a week pursuant to N.J.A.C. 11:5-4.4(a).  The Commission's reliance on Tatarek's testimony, coupled with Karpf's admissions, outlined above, provided sufficient evidence to support its findings.  There was more than enough evidence to support the allegations in the OTSC given Karpf's full-time employment as a teacher during the time he was purportedly supervising the office.  Moreover, there was adequate evidence the office was not open to the public in violation of N.J.A.C. 11:5-4.4(a).

A-3654-21

Although Karpf raises issues challenging the credibility of Tatarek, we find no basis to disturb the Commission's conclusions, which adopted the ALJ's credibility findings. Again, we "may not substitute [our] own judgment for the agency's, even though [we] might have reached a different result." Stallworth, 208 N.J. at 194 (quoting Carter, 191 N.J. at 483). "This is particularly true when the issue under review is directed to the agency's special 'expertise and superior knowledge of a particular field.'" Id. at 196 (quoting Herrmann, 192 N.J. at 28). Accordingly, we discern no basis to disturb the Commission's findings as to the violations of N.J.A.C. 11:5-4.4(a) and N.J.S.A. 45:15-17(e).

C.

Karpf next argues that N.J.A.C. 11:5-4.4 is "antiquated, outmoded, . . . provides no legitimate governmental purpose[,] . . . no benefit to the people of New Jersey[, and] therefore . . . cannot be enforced." In support of this argument, Karpf relies on the testimony of two of his real estate agents who testified the real estate industry has significantly changed since the creation of the internet, which requires less of a need to physically be in an office. The testimony highlighted how residential real estate customers do much of their searching for properties online and often utilize virtual tours. Specifically, one of the agents stated there will probably be a lesser need for agents in the future.

27

Karpf also asserts the regulations are "about protectionism . . . to deter out of state real estate companies from doing business in New Jersey solely through the internet, since [they] charge" two-percent commissions instead of six-percent, like in-state companies, which ultimately hurts the consumer. Karpf also argues the language in N.J.A.C. 11:5-4.4(a) is void for vagueness.

When an executive agency exercises its rulemaking function, it is afforded substantial deference. Commc'ns Workers of Am., AFL-CIO v. N.J. Civ. Serv. Comm'n, 234 N.J. 483, 513-14 (2018). Thus, we must "defer to an agency's interpretation of both a statute and implementing regulation, within the sphere of the agency's authority, unless the interpretation is 'plainly unreasonable.'" In re Election L. Enf't Comm'n Advisory Op. No. 01-2008, 201 N.J. 254, 262 (2010) (quoting Reilly v. AAA Mid-Atl. Ins. Co. of N.J., 194 N.J. 474, 485 (2008)). Moreover, we cannot substitute our judgment for that of the agency. In re Polk, 90 N.J. 550, 578 (1982).

Given the substantial deference we afford to the Commission in rulemaking, we are unpersuaded by Karpf's contentions. The regulations are not plainly unreasonable. The Commission's interpretation and the implementation of N.J.A.C. 11:5-4.4(a) is well within the reasonable bounds of agency interpretation.

Both the ALJ and the Commission found this argument unavailing relying on Pipes's[12] mandate that "a heavy burden is imposed upon those who challenge the validity of a regulation . . . .  The [p]etitioner must prove that the regulation is arbitrary, unreasonable or non-compliant with the legislative mandate."  The Commission is charged with protection of the public, and their implementation of this regulation is in accordance with such mandate.  In Pipes, in addressing a challenge to a different portion of the regulations, N.J.A.C. 11:5-3.8(a), we observed:

> The obvious purpose of the Commission's regulation . . . is to ensure that real estate brokers possess experience not only in the sale and lease of real estate but also in the day-to-day operation of the brokerage business such as the management of fiduciary accounts, drafting of contracts, interaction with financial institutions and other professionals including supervision of real estate salespersons.  In an industry in which many salespersons work part-time or primarily on weekends, the subject regulation is a recognition that a full-time commitment to the real estate brokerage business insures greater protection to the public.
>
> [329 N.J. Super. at 397 (citations omitted).]

This same rationale applies to N.J.A.C. 11:5-4.4(a).  Moreover, if Karpf needed clarification regarding the operation of his office under N.J.A.C. 11:5-4.4(a), he

---

[12]  In re Pipes, 329 N.J. Super. 391, 397 (App. Div. 2000).

could have submitted an inquiry to the Commission for clarification. Further, he could have submitted a petition for rulemaking pursuant to N.J.S.A. 52:14B-4(f), if he believed the regulations needed to be changed. Accordingly, we reject Karpf's arguments on this issue.

Nevertheless, we briefly note, given the significant changes in technology since the amendments to N.J.A.C. 11:5-4.4(a) in 1988, it may be appropriate for the Commission to revisit the regulations. We recognize N.J.A.C. 11:5-4.4(a) was promulgated based on N.J.S.A. 45:15-12, which requires "[e]very real estate broker shall maintain a designated main office open to the public." However, the widespread utilization of the internet, the ubiquitous use of smartphones, emails, text messaging, video conferencing, remote work, and the electronic signing of documents has had a substantial impact on the way society conducts business. The Commission should consider whether N.J.A.C. 11:5-4.4(a) should be amended to account for these changes. Of course, this function is entrusted to the Commission, not the courts.[13]

---

[13] In other highly regulated areas such as the practice of law, we have seen changes such as the amendments to the bona fide office rule. See R. 1:21-1(a)(1) (eliminating the requirement for an attorney to "maintain a fixed physical location" to practice law). Still, to ensure "prompt and reliable communication" between an attorney and client, Rule 1:21-1(a)(1) requires that "an attorney must designate one or more fixed physical locations where client files and the

A-3654-21

Karpf also argues that certain terms in N.J.A.C. 11:5-4.4(a), such as "usual business hours," "full-time basis," and "open to the public," are void for vagueness. We are unpersuaded.

"The vagueness doctrine 'is essentially a procedural due process concept grounded in notions of fair play.'" State v. Lenihan, 427 N.J. Super. 499, 512 (App. Div. 2012) (quoting State v. Lee, 96 N.J. 156, 165 (1984)). "The vagueness doctrine is premised on the notion that the law must 'give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly.'" State v. Stafford, 365 N.J. Super. 6, 15 (App. Div. 2003) (quoting Grayned v. City of Rockford, 408 U.S. 104, 108 (1972)). "In determining vagueness, a common sense approach is appropriate in construing the enactment in terms of the persons who may be subject to it, and in context with its intended purpose." Ibid. (quoting Chez Sez VIII, Inc. v. Poritz, 297 N.J. Super. 331, 351 (App. Div. 1997)). A statute need not be a "model of precise draftsmanship" to "sufficiently describe[] the conduct that it proscribes." State v. Afanador, 134 N.J. 162, 169 (1993).

---

attorney's business and financial records may be inspected on short notice by duly authorized regulatory authorities, where mail or hand-deliveries may be made and promptly received, and where process may be served on the attorney for all actions, including disciplinary actions . . . ."

N.J.A.C. 11:5-4.4(a) is not void for vagueness. Notwithstanding Karpf's contention, the Commission adopted a reasonable and sensible reading of the regulation and the terms "usual business hours," "full-time basis," and "open to the public." We discern nothing in the regulation as unconstitutionally vague based on the commonplace meaning of the terms used in the regulation.

D.

Karpf next asserts that this matter should be dismissed as his due process rights were violated because the Commission relied on N.J.A.C. 11:5-3.8, which was not charged in the OTSC. Alternatively, he contends N.J.A.C. 11:5-3.8 supports his position because he worked more than forty hours a week between the hours of 10:00 a.m. and 8:00 p.m.

The Commission correctly noted Karpf was not found to have violated N.J.A.C. 11:5-3.8. Instead, N.J.A.C. 11:5-3.8 was referenced by the ALJ as guidance to interpret N.J.A.C. 11:5-4.4(a). Moreover, N.J.A.C. 11:5-3.8 is a regulation that addresses salespersons seeking to become a broker and does not alter the requirements for a broker under N.J.A.C. 11:5-4.4(a). Ultimately, as noted by the Commission, even though the ALJ referenced N.J.A.C. 11:5-3.8, she noted the definition of "usual business hours" were "those hours of the day during which, in a given community, commercial, banking, professional, public,

32

or other kinds of business are ordinarily carried on." The Commission further determined "the uncontroverted fact remains that [Karpf] was employed full[-]time during normal business hours [as a teacher] when he had the responsibility to ensure his broker's office . . . was open to [the] public and being properly supervised" pursuant to N.J.A.C. 11:5-4.4(a). Accordingly, we are unconvinced by Karpf's contentions regarding N.J.A.C. 11:5-3.8.

E.

Karpf argues there should not be a penalty in this matter because: he did not act in bad faith; did not profit from illegal activity; there was no injury to the public; he reasonably believed there was no violation of a regulation; there was no criminal conduct; and he had no past violations.

Under the Act, the Commission may take action against a licensee for the violation of any of the provisions of the Act or the regulations promulgated thereunder. N.J.S.A. 45:15-17(t). If a violation is found, it may place on probation, suspend, or revoke the license of a real estate salesperson for "[a]ny conduct which demonstrates unworthiness, incompetency, bad faith or dishonesty." N.J.S.A. 45:15-17(e). The Commission may also impose "a penalty of not more than $5,000 for the first violation, and a penalty of not more

than $10,000 for any subsequent violation," in place of, or in addition to, any license suspension or revocation. N.J.S.A. 45:15-17.

An agency has "broad discretion in determining the sanctions to be imposed for a violation of the legislation it is charged with administering." In re Scioscia, 216 N.J. Super. 644, 660 (App. Div. 1987). Correspondingly, appellate courts have limited "review of an agency's choice of sanction . . . ." In re License Issued to Zahl, 186 N.J. 341, 353 (2006). The appropriate test for reversal is "whether such punishment is so disproportionate to the offense, in light of all the circumstances, as to be shocking to one's sense of fairness." Id. at 354 (internal quotation marks omitted) (quoting Polk, 90 N.J. at 578).

Our Supreme Court delineated a list of factors to consider in determining whether an agency's monetary sanction is arbitrary, capricious, or unreasonable: (1) the licensee's good or bad faith; (2) the licensee's ability to pay a financial penalty; (3) the amount of profit earned from wrongful activity; (4) the extent of any injury to the public; (5) the duration of the wrongful activity; (6) the existence of any criminal actions; and (7) the existence of any prior violations. Kimmelman, 108 N.J. 137-40.

As to the first Kimmelman factor, the Commission determined Karpf demonstrated bad faith because he was aware of his responsibilities under the

Act, "including the requirement to have his office open to the public during usual business hours." Because it determined Karpf's arguments were disingenuous and self-serving, this factor favored a higher monetary penalty.

The Commission found there was no evidence presented as to the second Kimmelman factor—Karpf's ability to pay. It determined it was Karpf's burden to prove his inability to pay a fine, and he failed to do so. Because it was not met, the Commission viewed the factor as neutral.

As to the third Kimmelman factor, which addresses the profits obtained or likely to be obtained from the illegal activity, the Commission observed the profits obtained by Karpf were unclear but noted that he worked during normal business hours while operating a real estate brokerage, which it determined favored a monetary penalty.

Regarding the fourth Kimmelman factor—whether the licensee's conduct caused an injury to the public—the Commission determined "the public is harmed when licensees fail to comply with Commission regulations. When a licensee is unable to conduct himself in accordance with the high standards expected of him and his profession, the public's confidence in the real estate industry is eroded." The Commission determined this factor weighed heavily in favor of a higher monetary penalty.

The fifth Kimmelman factor concerns the duration of the illegal activity. The Commission concluded Karpf's conduct lasted for well over a decade, which weighed in favor of a higher penalty.

The sixth Kimmelman factor required the Commission to determine the existence of any criminal punishment and whether a civil penalty may be unduly punitive if other sanctions had been imposed. The lack of criminal punishment weighs in favor of a more significant civil penalty under Kimmelman. Id. at 139. Because Karpf had not suffered any criminal penalties, the Commission determined this factor favored a higher monetary penalty.

The seventh, and last Kimmelman factor, required the Commission to consider the previous relevant regulatory and statutory violations of the licensee. It agreed that Karpf had held a broker's license since 1979 and had no history of any regulatory or statutory violations, and therefore considered this a mitigating factor in favor of Karpf.

Based on this analysis, the Commission modified the recommendations of the ALJ and imposed a $5,000 monetary penalty. It appropriately considered the Kimmelman factors prior to imposing the monetary sanction. We discern no basis to disturb the finding as we cannot say the Commission's monetary

sanction, even though more stringent than the ALJ's recommendation, "shock[s] [our] sense of fairness." Herrmann, 192 N.J. at 28-29.

F.

We now direct our attention to the Commission's imposition of a three-year suspension. It noted that given the "seriousness of [Karpf's] actions," it modified the ALJ's recommendation of a two-year suspension to three years. The Commission based its decision on its findings Karpf failed to: properly supervise his office on a full-time basis; keep the office open to the public during regular business hours; and be physically present during usual business hours at least five days a week. This, coupled with the fact that this conduct occurred over a period of several years, demonstrated unworthiness, incompetence, and bad faith under N.J.S.A. 45:15-17(e). Lastly, the Commission expressed concern regarding Karpf's "disingenuous and self-serving arguments" which it determined demonstrated his lack of appreciation for the seriousness of his conduct.

We are mindful of the deference we owe to the Commission with respect to the imposition of sanctions such as a suspension. However, we conclude it failed to properly consider the countervailing issues that would potentially serve to mitigate the extent of such a suspension. For example, it is undisputed that

37

this matter was not prompted by a customer complaint, but rather an anonymous complaint. In fact, the Commission did not reference any history of customer or agent complaints regarding the operation of Karpf's real estate office during the forty years he operated his business. He had no past regulatory violations, and there were no allegations of any misappropriation of funds. There was also no specific injury to the public, and his conduct did not involve any criminal activity.

Although we do not condone Karpf's actions, the record does demonstrate an otherwise unblemished record, which the Commission overlooked. Therefore, we direct the Commission to consider the mitigating evidence on remand in deciding an appropriate suspension. Although we recognize the Kimmelman factors are traditionally utilized to evaluate monetary fines, certain factors may, nevertheless, be considered by the Commission in determining whether to impose a suspension. For example, the Commission may consider the licensee's good or bad faith; the amount of profit earned from wrongful activity; the extent of any injury to the public; the duration of the wrongful activity; the existence of any criminal actions (which may, contrary to this factor's application under Kimmelman for the purposes of monetary damages, actually be viewed as a mitigating factor in the absence of criminal conduct for

the purposes of a suspension); the existence of any prior violations; and any other factors deemed relevant by the Commission in its sound discretion to impose an appropriate and fair sanction.

To the extent we have not specifically addressed any of Karpf's remaining arguments, we conclude they lack sufficient merit to warrant discussion in a written opinion.  R. 2:11-3(e)(1)(E).

Affirmed in part, vacated in part, and remanded for further proceedings consistent with this opinion.  We do not retain jurisdiction.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION